LEWIS KELLY, *Plaintiff in Error,* v. STATE OF FLORIDA, *Defendant in Error.*

Division A.

Opinion filed July 31, 1928.

*Moses Guyton*, Attorney for the Plaintiff in Error.

*Fred H. Davis*, Attorney General, and *Roy Campbell*, Assistant, Attorneys for the Defendant in Error.

Brown, J.—Plaintiff in error was convicted in the circuit court of Jackson county of murder in the first degree without recommendation and a death sentence imposed. It is a case of circumstantial evidence. Plaintiff in error appears from the evidence in the record to have been a Cuban or possibly West Indian negro of mixed blood. He

testified that he was born in Key West. It appears that his ability to speak English was very limited and imperfect. Two boys from the State Industrial School in Marianna, one from Key West and the other from Tampa, who testified that they were familiar with the Spanish or Cuban language, were called in by the court to act as interpreters. The testimony of the defendant, as interpreted and contained in the record, is not very clear. The two interpreters, who were sworn as witnesses after they had attempted to interpret defendant's testimony, testified that defendant stated that he spoke Cuban, but that this did not appear to be the fact. One of the interpreters testified as follows:

"I lived in Key West fourteen years before I came here, nearly fifteen. Yes, sir; I know the different languages they speak around Key West among the colored folks. Yes, sir; I have tried to talk to this defendant in these different languages; no, sir; he didn't understand any of them; he does not answer anything I ask him in that language. Yes, sir; I know the language they use in Cuba; there is no difference in the language they use in Cuba and the Spanish language. Yes, sir; I can speak Spanish fluently."

The other interpreter stated:

"I am Spanish and I speak the Spanish language. I was sent to the Industrial School from Tampa. I lived in Tampa sixteen years. Yes, sir; I have attempted to talk to this defendant, Lewis Kelly, today in Spanish; he does not respond to my questions in Spanish. Yes, sir; I know the language they use in Cuba; they use the Cuban language; there is no difference in the Cuban language and Spanish language. In my conversation with him he doesn't show that he knows anything about the Spanish language. I don't know what language he understands; I know he doesn't understand the Spanish language."

So, by their own testimony, it would appear that these interpreters were not capable of correctly understanding and interpreting the testimony of the defendant. While the extent of defendant's ability to make himself understood in the English language is not clearly disclosed by the record, it would appear that it was necessary for the defendant's testimony to be interpreted, in order to make it fairly intelligible to the jury, else the Court would not have called in and attempted to use interpreters. In Wigmore on Evidence, 2nd ed., Sec. 811, there appears the following discussion of the rules pertaining to the interpretation of testimony by the author of that work, which, omitting the authorities cited in the footnotes, reads in part as follows:

"*Deaf-mutes, Aliens, Inaudible Witnesses; Interpreters* and *Translations*. The mode of communication will usually be in words or other symbols directly intelligible to the tribunal. If the witness cannot employ a mode thus directly intelligible, some intermediary may and must be sought who can interpret the witness' mode into the ordinary one:

"Withers, J., in Kuhlman v. Brown, 4 Rich. L., 479, 485, (admitting a translated deposition) : 'Upon general principles it is contended that our law exacts the English tongue as its only language. This is true as to the pleadings, and it is also true that it speaks that language to the jury. But is it true that it hears no other? Every day experience testifies the contrary. Any language is heard in court where a foreign witness must be used there. And what is the office that the law performs? It requires that means shall be furnished by the actor on that occasion, or in some manner provided, to convert the testimony, clothed and adduced in a foreign tongue, into that which the jury

who are to estimate it comprehend  *  *  *  It is enough to remark that every expedient should be favorably regarded, and that most favorably, the tendency of which gives the strongest promise of an intelligible transmission of the evidence to the jury through a medium capable, unbiased, faithful.'

"It is clear that testimony must not be allowed to fail if some process of interpretation is available. The conditions under which it is to be resorted to are the simple dictates of cautious common sense.

"1. Interpretation is proper to be resorted to whenever a necessity exists, but not till then:

"1858, O'Brien, J., in R. v. Burke, 8 Cox Cr. 45, 47: 'The value of this test (cross-examination) is very much lessened in the case of a witness, having a sufficient knowledge of the English language to understand the question put by counsel, pretending ignorance of it, and gaining time to consider his answers while the interpreter is going through the useless task of interpreting the question which the witness already understands'.

"1908, Mr. Arthur Train, The Prisoner at the Bar 239: 'Where the witness speaks a foreign language, the task of discovering exactly what he knows, or even what he actually says, is herculean. In the first place, interpreters, as a rule, give the substance—as they understand it—of the witness' testimony rather than his exact words. It is also practically impossible to cross-examine through an interpreter, for the whole psychological significance of the answer is destroyed, ample opportunity being given for the witness to collect his wits and carefully to frame his reply. One could cross-examine a deaf-mute by means of the finger alphabet about as effectively as an Italian through a court

interpreter, who probably speaks (defectively) seventeen languages.'

''Whenever the witness' natural and adequate mode of expression is not intelligible to the tribunal, interpretation is necessary. Whether the need exists is to be determined by the trial court.

''There are three general classes of persons for whom such a necessity may exist: (a) persons *organically unable* to use words, and obliged to communicate by ordinary gestures or by a systematic sign language, *i. e.*, most commonly deaf-mutes; (b) persons speaking exclusively or more naturally a *language alien* to that used by the tribunal; (c) persons unable, through diffidence or illness to *speak loud enough* for the tribunal to hear distinctly.

''2. If interpretation is necessary, and no *adequate means* of securing it is practicable, the testimony is lost, for without adequate communication (*ante,* Par. 766) there can be no testimony.

''3. What sort of a person is a proper one to be *interpreter,* is a question depending much on the circumstances and should be determined by the trial judge.

''Courts in the metropolitan cities do not exercise sufficient care to provide a staff of honest and competent interpreters. They become callous to the grist of petty criminal cases; and they tend to forget that one of the cruelest injustices is to place at the bar a person of alien tongue and then fail to provide him with the means of defending himself by intelligible testimony. Many courts are open here to severest censure.

''4. The *form* of interpretation will ordinarily be *oral.* Even for letters or other documents offered to

the jury, it may be oral, on the principle of 799, *ante;* though a written translation is customarily employed.

"For *depositions,* however, which in the modern legal theory exists only in writing (*ante,* Par. 802), the transalation must equally be in writing; and statutes sometimes prescribe this. The time of translation must for ordinary oral testimony to the jury be immediate; but for depositions it would seem that this is not essential, at least where (as is usual) the commissioner taking it understands the witness's language and the translation is needed only for the trial-tribunal."

In Sec. 812 of the same work it is said that an interpreter must take an oath to interpret truly. See also Sec. 1824, which is to the same effect. It does not appear that this rule was observed upon the trial of this case; at least the record does not show such compliance. The failure to administer the proper oath to a witness renders the witness incompetent. Crockett v. Cassels (Fla.), 116 So. R. 865. The subsequent swearing in of the interpreters as witnesses after the defendant had testified, did not operate as a compliance with the above rule.

With the information before the court, which appears to have indicated that the defendant spoke the Spanish language, or such Spanish as is currently spoke in Cuba, or by the Cuban population in Key West and Tampa, the court appears to have made a commendable effort to secure qualified interpreters, under the existing circumstances. However, it appears just as clearly, from the testimony of the interpreters themselves, that the defendant did not speak the language which they were called to interpret. We cannot say therefore from this record that the defendant's testimony was correctly interpreted to the

jury. It is true the record indicates that the defendant was able to speak some kind of broken English, but we are unable to say from the record that his ability in this direction was sufficient to enable him to make his testimony correctly and intelligibly understood by the interpreters or by the jury. One of the interpreters testified, as above shown, that: "I don't know what language he understands, I know he doesn't understand the Spanish language." We fully recognize that this created a difficult and puzzling situation for the court to deal with. And furthermore the record shows that the trial judge was quite fair to the defendant in all of his rulings and endeavored to conduct the trial with entire justice to both the State and the defendant. But under the law a defendant in a criminal prosecution has the right, if he so desires, to testify as a witness in his own behalf, and in order to make this right fully effective it is necessary that his testimony be made fairly intelligible to the jury when it is practicably possible to do so. And in this case, it is quite clear that the testimony of the defendant was important to his defense; especially so in view of the fact that the conviction was based upon circumstantial evidence. In such cases, it is not enough that the facts testified to by the State's witnesses create merely a strong proof of guilt, but the facts must be inconsistent with defendant's innocence and of such conclusive nature and tendency as to be sufficient in law to satisfy the mind and conscience of the jury of the defendant's guilt to a moral certainty. See Fudge v. State, 75 Fla., 441, 78 So. R. 510; Asher v. State, 90 Fla., 75, 105 So. R. 140; Davis v. State, 107 So. R. 245, 90 Fla., 816; Lee v. State, decided at the present term. We conclude therefore that in view of all the circumstances of this case as disclosed by the record, the motion for a new trial should have been granted. It therefore becomes our duty

to reverse the judgment brought before us by writ of error and remand the cause for new trial in the court below.

Reversed.

ELLIS, C. J., AND STRUM, J., concur.

WHITFIELD, J., concurs in the opinion and judgment.

BUFORD, J., dissents.