

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0413-08

**AUDREY R. LINTON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### MONTGOMERY COUNTY

COCHRAN, J., delivered the opinion of the unanimous Court. JOHNSON, J., filed a concurring opinion.

### O P I N I O N

Appellant is deaf. She contends that she did not have adequate deaf-translation services at trial. In this case, we find that the three deaf interpreters provided by the trial court were constitutionally sufficient.[1] We therefore reverse the court of appeals, which had

---

[1] We granted the State's Petition, which asked,

1.  What is the standard of review in determining whether the trial court took adequate steps to ensure that the appellant had a minimum understanding of the proceedings?

2.  Is the opinion of a defense expert, alone, sufficient to establish that a deaf relay interpreter was required when the expert did not use a deaf relay interpreter to evaluate the defendant; neither the defendant, counsel, nor the counsel-table interpreter testified

held, in essence, that the trial court reversibly erred in not providing the "best" interpretive services–including a deaf-relay interpreter–to ensure appellant's full understanding of the trial proceedings.[2]

# I.

## THE TRIAL AND APPEAL

### A.    The Motion to Suppress

Early one rainy morning, appellant, while driving down Chateau Woods Parkway, rear-ended another car. The police investigated the accident and arrested appellant for DWI after she failed a field sobriety test. She was videotaped at the police station as she and an officer both read the "DIC-24" form.[3] Appellant agreed to take a breath test; its results showed a blood-alcohol content of .187 and .193.

Appellant filed a motion to suppress the breath-test results, arguing that she did not understand that she had the right to refuse a breath test. At a pretrial hearing, appellant

---

that the defendant could not assist counsel; and the record shows that the defendant had a rational understanding of the charge against her and the facts?

3.    What minimum level of comprehension is required to assure a defendant's constitutional rights during a trial? In other words, is a fourth grade linguistic comprehension sufficient if the defendant has a rational as well as factual understanding of the proceedings, has spontaneously and appropriately responded to testimony, and there is no evidence that the defendant could not assist counsel in her defense?

[2] *Linton v. State*, 246 S.W.3d 698 (Tex. App.—Corpus Christi 2007).

[3] Form DIC-24 is the written component of the statutory warning required in cases where a peace officer requests a voluntary blood or breath specimen from a person. *See* TEX. TRANSP. CODE § 724.015; *State v. Neesley*, 239 S.W.3d 780, 782 n.1 (Tex. Crim. App. 2007).

testified, through a certified American Sign Language interpreter, that she was unable to communicate with the arresting officer and that she took the breath test only because she "thought it was a requirement." She said that she could not understand the papers she was given to read, and she could not read the officer's lips because he had a mustache. The judge then asked her some questions that she answered coherently. She said that she was a high-school graduate, she has a driver's license, and she was enrolled in Blinn College,[4] but she had not learned how to read and write very well. The court reporter's record reveals that appellant gave several audible responses before the interpreter translated.

Deputy Woodrick then testified about the arrest. He said that it was hard to communicate with appellant. "The way I communicated with her was I would write notes, she would read the notes, and then she would answer my questions" orally. She indicated that she understood his questions, and her verbal answers were "[a]bsolutely" appropriate. The deputy said that appellant indicated that she understood the language in the DIC-24 form as well as her *Miranda* rights.

When the trial judge asked Deputy Woodrick about the circumstances of the accident, appellant clarified one of the deputy's answers:

Witness:    Well, part of the damage to the other vehicle. She hit the vehicle on the left corner and caused it to spin, and it slammed into a tree because –
Judge:    Okay.
Appellant:    I did not hit the tree.
Witness:    She didn't hit the tree. The other vehicle hit the tree.

---

[4] Appellant said that she had failed her classes at Blinn College.

The station-house video was played, and the interpreter said that appellant signed "I don't understand" on the video five or six times.

The trial judge denied the motion to suppress, pointing out that appellant was a high school graduate and a college student. He explained that, while he had "heard . . . she's got a big hearing problem," he had not "heard anything about a mental problem." The trial judge rejected appellant's claim that she did not understand her right to refuse a breath test.

**B.    The Trial on the Merits**

By the time the trial began, a new defense attorney, a new trial judge, and new interpreters were involved. Appellant's attorney asked the judge to reopen the suppression hearing, arguing that prior counsel had been ineffective by failing to (1) request an expert to evaluate appellant, who, he claimed, reads at an elementary-school level, and (2) contest the reliability of the field tests based on the communications gap. The trial judge deferred ruling until she had seen the station-house video, and the parties proceeded with voir dire.

After voir dire, the judge called both court-appointed interpreters to the witness stand for the defense and prosecution to question them. Both testified that they were able to effectively convey what was being said to appellant. They were using transliteration instead of ASL,[5] because that was what appellant used with them. Defense counsel said that

---

[5] "Transliteration is the means by which spoken English is converted word for word into visual English. . . . Transliteration conveys the words being spoken. It does not decode the spoken English–that is, it does not get to the meaning. Rather, it recodes the English, making the spoken word visible, either in signed form or orally." Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WISC. L.REV. 843, 871 (2003). "ASL is frequently thought of as English in signed form. It is not. ASL is frequently

transliteration would not work because "she doesn't understand English." He said that he would call his own expert later.

The trial testimony began with Marian Dale Embry explaining that she was rear-ended by appellant's car at 6:30 in the morning on November 17, 2003–"a misty kind of light rainy day." Ms. Embry helped appellant out of her truck and noticed that she "reeked" of alcohol. Because it was chilly and wet, Ms. Embry had appellant sit in her car until the police came. Although Ms. Embry knew that appellant was deaf, they were able to exchange information.

Deputy Woodrick then testified much as he had at the hearing on the motion to suppress. He said that, when he arrived at the accident scene, appellant smelt strongly of alcohol, her eyes were red, and she was unsteady on her feet. He testified that they were able to communicate through writing and that appellant could speak to him. When he couldn't understand her, he had her write down what she was saying. He said that she failed the "one-leg-stand" field test: "She just couldn't balance on one foot." He arrested her for DWI.

## C.    The Motion for Mistrial Hearing

At the beginning of the second day of trial, defense counsel moved for a mistrial, claiming that appellant was not understanding the proceedings: "[T]his goes back to her level of education and the level of competence one might have to have to go to McDonald's

---

thought of as spelling out every English word via the deaf alphabet. It is not. ASL is its own unique language, one that is far from English. ASL has been likened to written Chinese in that it is ideographic, meaning that 'the character correlates directly with the meaning.' Though one language is written and one is not, the languages share the common trait of presenting ideas, thought, and comment in spatial form." *Id.* at 875 (footnotes omitted).

and order a hamburger."

The trial judge held a hearing on the mistrial motion, and appellant's pastor testified that he had known appellant for more than eleven years. He said that appellant neither signs straight English nor straight ASL; they communicate in a combination of English and broken ASL. He said that appellant told him that morning that she had been confused "a lot" during the preceding day. "My opinion is that there is some concepts, words and vocabulary and things that needs to be broken down into concepts for Audrey." He gave an example: the interpreters had used the sign for "witness" several times the previous day, but appellant thought that everyone was saying "Willis," because the sign for the city of Willis is the same.

Next, Dr. Jean Andrews testified that she was the director of graduate programs in deaf education at Lamar University. She said that appellant is prelingually deaf–she became deaf before she learned how to speak–and she reads at a 4th grade level. According to Dr. Andrews, the DIC-24 form is written at a 12th-grade reading level and the *Miranda* warnings are at an 8th-grade reading level. She testified that the transliteration used by the two court translators is essentially finger-spelling, but that does not help someone, like appellant, who does not understand the meaning of the word being finger-spelled. She testified that deaf people commonly smile and nod when they do not understand something, and she saw appellant doing this on the videotape. She also signed three times that she did not understand "what was going on in that room." Dr. Andrews said that she was in the courtroom the day before. Based on her assessment of appellant and the signing that the interpreters were

doing, it was her opinion that appellant did not understand what was going on during the trial because of her deafness, her education level, and her language deprivation. She is "semi-lingual," that is, proficient neither in English nor ASL, and therefore, "linguistically incompetent."

The trial judge denied the motion for mistrial but, under Article 38.31(b), appointed a third interpreter to sit at counsel table. Counsel asked for and received more time to explain to appellant "what's going on." Before the jury came back, counsel put on the record that the table interpreter would be allowed to do more than literally translate:

Counsel:    And so I'm clear on the record, Judge, in appointing Ms. Trevino to assist me, she is allowed, unlike the current two interpreters interpreting for the Court, where they have to do a literal translation, she is allowed to break down anything to the level at which Ms. Linton can understand. Is that correct?

Court:    That is correct. She can do it in a way so that the defendant can understand. Of course, this will be done, not simultaneous to the interpreting of the interpreters, but at the time that the Court takes its breaks.

Counsel:    I can live with that.

The prosecutor then questioned Dr. Andrews and she recommended that a deaf interpreter[6] be appointed:

Q:    Are you asserting to this Court that there would be some other way to interpret for the defendant where she would be able to comprehend the proceedings of this court?

A:    Well, there is a way. That would be to have a deaf interpreter that would work

---

[6] A deaf interpreter functions "in an intermediate capacity between the court interpreter who can hear and the deaf litigant." Brief for Registry of Interpreters for the Deaf, Inc. et al. as Amici Curiae Supporting Appellant, at 1. *See* Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge*? 26 ARIZ. ST. L.J. 163, 184 (1994) ("The deaf interpreter may use rudimentary ASL, pantomime, drama, and gestures.").

alongside of the hearing interpreter. And when the client did not understand what the hearing interpreter was doing, the deaf interpreter would be watching the hearing interpreter and then act it out through mimes, through gestures, to communicate, break down the concept pantomime and gestures for the deaf client, and this is commonly used in many deaf cases.

* * *

Q:    So it's not simply because the defendant is deaf that she cannot understand what's going on?

A:    Correct. It's her linguistic background.

Defense counsel again requested to re-open the motion to suppress and argued that the trial court's solution of a table interpreter was inadequate because "I've been restricted, as you stated, to communicating with [appellant] on breaks." The State replied:

> [T]here is no requirement that . . . everything that happens in the courtroom be explained in depth to someone who doesn't understand because of their education level . . . . It is entirely possible that someone could sit in this courtroom without any kind of documented or legally recognized disability and because of their reading level, their comprehension, their life experiences, not understand everything that is going on. That doesn't mean that they are not competent to stand trial.

The trial court again denied the motion for mistrial and the motion to suppress.

**D.    The Continuation of Trial**

Deputy Woodrick was recalled and testified at length about the arrest at the accident scene and the tests at the station. The station-house videotape was played in short segments, and Deputy Woodrick was questioned about each segment. He gave his lay opinion about appellant's performance on the field tests; she did "okay" on the walk-and-turn test, but had balance problems on the other two tests. He said that he did not know what appellant was signing on the video, but he felt he had "effectively communicated with her."

After a lunch break, the judge noted for the record that there were two interpreters for the court with a third sitting at counsel table for appellant and her attorney.  She told the interpreters that "if you need time, tell me . . . I'll understand that." Deputy Woodrick finished testifying, and after calling the intoxilyzer expert, the State rested.

The defense called an expert to testify that appellant was not a proper candidate for field sobriety tests because of her (1) inability to understand the instructions and (2) balance difficulties.  Dr. Andrews testified before the jury and gave essentially the same testimony that she had at the earlier hearing: Appellant reads at a 4th-grade level and much of the courtroom proceedings were above her comprehension level.  According to Dr. Andrews, appellant did not understand the *Miranda* warnings or the DIC-24 form.  About twenty to twenty-five percent of the transliteration was "incomprehensible to her."  For that twenty percent, she needed concepts broken down.  Appellant had an average IQ, but was linguistically incompetent.  Appellant did not testify.

The jury found appellant guilty, and the trial judge placed her on community supervision.  The entire trial was videotaped, and all of the cassettes of the translations were entered into evidence for the appellate courts.

E.    **The Motion for New Trial Hearing**

Appellant filed a motion for new trial, and Dr. Andrews testified a third time.  She said "there's no way that [appellant] could understand what was happening in the courtroom using the method of transliteration which was used in this Court."  She said, "If she had the

right kind of interpreter," appellant would "possibly" be able to understand the proceedings. She needed a hearing interpreter, a deaf interpreter, and a table interpreter.  Those three interpreters would need to spend "a minimum of ten hours to talk to her and to get a level of what she's understanding and also maybe to go over some of the terminology."  Elaine Roberts, the legal director for Advocacy Incorporated, testified that the interpreters had indicated that they could not verify that appellant knew what was going on.  Defense counsel argued that the law requires that the interpretation be "tailor-made" and that once the trial judge was apprized that appellant was not understanding the proceedings, she had a "duty to try and correct that.  And that wasn't done." Defense counsel implied that appellant was incompetent to stand trial because she did not have the present ability to consult with him. He analogized this trial to having a "Spanish interpreter not using the same dialect as the defendant.  Spanish has many different dialects."  Here, the right dialect was not used.

Neither appellant nor her attorney testified to specific examples of crucial testimony that appellant did not comprehend.  Nor did they give concrete examples of how appellant failed to participate in her defense because of her linguistic incompetence.

The State reminded the judge that one of the interpreters had actually said that he was using a combination of ASL and signed English because that is what appellant was using with him and that she responded appropriately when he spoke to her.

The judge, after noting that she had carefully considered the record, the testimony on the motion for new trial, and the arguments that had been made, denied the motion for new

trial.

## F.    The Court of Appeals' Opinion

On appeal, appellant argued that trial court failed to make proper accommodations for her hearing impairment.  As a result, she was left "linguistically incompetent"–unable to understand or have a command of the interpreted language presented to her–and therefore she was entitled to a new trial.  The court of appeals agreed.  It held,

> Based on the record as provided, and under the circumstances of this case only, we find that the appointment of an additional interpreter to break down concepts during breaks in trial was insufficient to provide Linton with a thorough understanding of the proceedings against her.  Moreover, given that the English based transliteration did not account for Linton's low level comprehension of the English language, we find that the transliteration provided was also inadequate.
>
> ***
>
> Given the complexity of Linton's hearing impairment, we believe that the trial court erred in not providing Linton with the assistance of a deaf-relay interpreter.[7]

 The court of appeals remanded the case for a new trial.

## II.

It is well settled that if a defendant cannot hear or does not speak English well enough to understand the trial proceedings or communicate with counsel, fundamental fairness and due process of law require that an interpreter be provided to translate between English and the accused's own language.[8]  Decisions regarding adequate interpretive services depend

---

[7] *Linton*, 246 S.W.3d at 704.

[8] Thomas M. Fleming, J.D., Annotation,  *Right of Accused to Have Evidence or Court Proceedings Interpreted, Because Accused or Other Participant in Proceedings Is Not Proficient*

upon a potpourri of factors, including the defendant's understanding of the English language and the complexity of the pertinent law and its procedures, and the testimony. Therefore, the trial judge–having the defendant in his presence, observing his level of comprehension, and asking him questions, has wide discretion in determining the adequacy of interpretive services.[9] The question on appeal is not whether the "best" means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings.

## A.    The Constitutional Requirement

The federal constitution "requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense."[10] It is the trial judge's task to ensure that the defendant has that minimum understanding.[11]

As a matter of Texas law, Article 38.31(a) of the Code of Criminal Procedure requires a trial judge to provide an interpreter for a deaf person to interpret "in any language that the

---

*in the Language Used*, 32 A.L.R.5th 149 § 3[a] (1995).

[9] *See, e.g., Shu Guo Kan v. State*, 4 S.W.3d 38, 41 (Tex. App.—San Antonio 1999, pet. ref'd) ("The competency of an individual to act as an interpreter is a question for the trial court, and absent a showing of abuse of discretion, that determination will not be disturbed on appeal."); *Mendiola v. State*, 924 S.W.2d 157, 162 (Tex. App.—Corpus Christi 1995, pet. ref'd, untimely) ("The competence of an interpreter is for the trial court's determination, and we will reverse such a ruling only for an abuse of discretion"; noting also that "while an interpreter's competency is a question of law, the accuracy of an individual translation is a question of fact."); *Montoya v. State*, 811 S.W.2d 671, 673 (Tex. App.—Corpus Christi 1991, no pet.).

[10] See the reasoning in *Ferrell v. Estelle*, 568 F.2d 1128, 1132 (5th Cir. 1978), *op. withdrawn on appellant's death*, 573 F.2d 867 (1978).

[11] *Id.*

deaf person can understand, including but not limited to sign language," and, when requested, a second interpreter to "interpret. . .communications concerning the case between the defendant and defense counsel."[12]   This statute implements the constitutional right of confrontation, which includes the right to have trial proceedings presented in a way that the accused can understand.[13]   Under that statute and the relevant constitutional provisions, the trial court has a duty to devise a communication solution that provides the particular defendant with "that minimum level" of understanding that is constitutionally required.[14]

"Such alternative methods may, for instance, include the use of sign language, finger

---

[12] TEX. CODE CRIM. PROC. art. 38.31(a) & (b).

[13] *Salazar v. State*, 93 S.W.3d 339, 340 (Tex. App.—Texarkana 2002, pet. ref'd).  "The right to have proceedings interpreted finds a ready analogy in the right to be competent at one's own trial. Whether a defendant's failure to understand the proceedings or assist in his defense is caused by a mental defect or a language barrier, the outcome is largely the same: a trial in which the defendant lacks the ability to participate in a meaningful way." *Garcia v. State*, 149 S.W.3d 135, 146 (Tex. Crim. App. 2004) (Keller, P.J., concurring). Other courts have relied on the test for mental capacity in analyzing whether a non-English-speaking defendant was deprived of the right to participate in his or her defense. *See United States v. Cirrincione*, 780 F.2d 620, 633-34 (7th Cir. 1985); *United States ex rel. Negron v. New York*, 434 F.2d 386, 389 (2d Cir. 1970); *Gonzalez v. Phillips,* 195 F. Supp. 2d 893, 902-03 (E.D. Mich. 2001); *Murillo v. State*, 163 P.3d 238, 241-42 (Idaho Ct. App. 2007).

[14] *Adams v. State*, 749 S.W.2d 635, 639 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) ("it is clear that *Baltierra*, *Ferrell*, and the Attorney General of Texas have recognized an obligation outside the statute, based on state and federal constitutional law, to fashion a remedy suitable to overcome a particular defendant's disability"); *see Baltierra v. State*, 586 S.W.2d 553, 559 n.11 (Tex. Crim. App. 1979) ("Counsel is not obliged to implement the right of confrontation. That duty is imposed upon the court by the confrontation clause in the Sixth Amendment and Article I, Section 10."); *Ferrell*, 568 F.2d at 1133 (trial court had duty to explore alternative means to provide defendant with a constitutional minimum understanding of the proceedings); Op. Tex. Att'y. Gen. No. JM-113 (1983) ("article 38.31 obligates a trial court to explore alternative methods of communication that are appropriate for each person"). *See also Lincoln v. State*, 999 S.W.2d 806, 809 (Tex. App.—Austin 1999, no pet.).

spelling, lip reading, written communication, or stenographers to provide simultaneous transcriptions, or a combination of these methods, depending a person's proficiency in the different systems of communication."[15]  The translation must be "true."  That is, it must be accurate.[16]  But as the Fifth Circuit noted in *Ferrell v. Estelle*,[17] it need not be "perfect":

> The Constitution does not . . . guarantee every defendant a perfect trial. The

---

[15] Op. Tex. Att'y. Gen. No. JM-113 (1983).  *See, e.g., Brazell v. State*, 828 S.W.2d 580, 581 (Tex. App.—Austin 1992, pet. ref'd) (defendant, who did not know sign language and was unable to read lips, was allowed to read the proceedings on the court reporter's monitor–which translated the transcription into English instantaneously).

[16] TEX. CODE CRIM. PROC. art. 38.31(e) requires that the translation be "true" and "in a language that the [defendant] understands."  For foreign language translation, "true" is sometimes equated with being simultaneous, continuous, and literal.  *See e.g. Guzmon v. State*, 697 S.W.2d 404, 407 n. 1 (Tex. Crim. App. 1985) ("Attorneys should ask their questions as if no interpreter was present. The interpreter should translate the question and answer in a literal manner.").  But in some cases–especially if the defendant is deaf–a simultaneous, continuous, and literal translation may not be possible.  *See* LaVigne and Vernon, *supra* note 5, at 876 ("For the majority of the deaf population . . . the interpreter must make subjective decisions about linguistic and cultural equivalents and how best to express them to the particular deaf person. On top of this, the interpreter must adjust for the syntactical differences between ASL and English, and make constant editorial and structural decisions. Common sense indicates that these adjustments by the interpreter take considerable skill, intuition, and–most valuably–time.").  *Cf. Ortega v State*, 659 S.W.2d 35, 39  (Tex. Crim. App. 1983 ) (translation made from the Spanish colloquialism, although not literal, was more accurate); *United States v. Bell*, 367 F.3d 452, 464 (5th Cir. 2004) (though method of translation was not simultaneous, victim's unique method of communication–a system of grunts and gestures–limited pool of potential interpreters); *Kang v. State*, 899 A.2d 843, 855 (Md. 2006) ("given the varying comprehension levels of defendants for whom English may be a second language and the intricacies of interpreting different languages, at this juncture, we shall not proclaim a single bright-line rule requiring simultaneous, word-for-word translation in all cases in which an interpreter is appointed").  The inherent factual difficulty of deciding whether a literally "accurate" translation in a particular case should take precedence over a more "appropriate" translation is yet another reason for granting trial judges, who can personally view and assess the perceived competence of the speaker and listener, great deference in these situations.

[17] *Ferrell v. Estelle*, 568 F.2d 1128 (5th Cir. 1978), *op. withdrawn on appellant's death*, 573 F.2d 867 (1978).

rights vouchsafed are practical, reasonable rights rather than ideal concepts of communication, and even these pragmatic rights may not be exercised without limit. The Constitution does not require that every defendant comprehend the English language with the precision of a Rhodes Scholar or appreciate the nuances of a witness' expressions or behavior with the skill of a doctor of psychology. Nor may a defendant press the exercise of his right to the point at which he disrupts the public's right to an orderly trial.[18]

## B.    The Standard of Review

Appellate courts must apply an abuse of discretion standard in reviewing whether the trial court took adequate steps to ensure that a deaf defendant sufficiently understands the proceedings to be able to assist in his own defense.  In *Garcia v. State*,[19] we held that

> when a trial judge is aware that the defendant has a problem understanding the English language, the defendant's right to have an interpreter translate the trial proceedings into a language which the defendant understands is a category-two *Marin* right. In these circumstances, the judge has an independent duty to implement this right in the absence of a knowing and voluntary waiver by the defendant.[20]

The question, then, is how much discretion does the trial court have in handling the issue of interpretive services?  The Eleventh Circuit, in *Valladares v. United States*,[21] stated, "Because the proper handling of translation hinges on a variety of factors, including the defendant's knowledge of English and the complexity of the proceedings and testimony, the

---

[18] *Id.* at 1131.

[19] 149 S.W.3d 135 (Tex. Crim. App. 2004).

[20] *Id.* at 145.  *See also Baltierra v. State*, 586 S.W.2d 553, 559 (Tex. Crim. App. 1979) ("when it is made known to the trial court that an accused does not speak and understand the English language an interpreter must be furnished to translate to the accused the trial proceedings").

[21] 871 F.2d 1564 (11th Cir. 1989).

trial judge, who is in direct contact with the defendant, must be given wide discretion."[22] We

agree with the many courts addressing foreign language and deaf interpretation, that

decisions regarding interpretive services are within the sound discretion of the trial court.[23]

This may be especially true in deaf interpretation because evaluating whether a hearing-

---

[22] *Id.* at 1566.

[23] *See State v. Lopez-Navor*, 951 A. 2d 508, 513 (R.I. 2008) (trial court has "large discretion" in selection, appointment, and retention of an interpreter); *Vui Gui Tsen v. State*, 176 P.3d 1, 7-8 (Alaska Ct. App. 2008) ("the decision whether to order word-for-word interpretation of the trial testimony necessarily hinges on many variables. Chief among these variables are (1) the extent to which the defendant can comprehend spoken English (i.e., understand the English speech of other people), (2) the extent to which the defendant can express himself or herself in English, and (3) the degree to which the trial testimony will present complex or subtle issues of fact that will require the defendant's input (i.e., the defendant's participation in formulating the defense case and in devising the cross-examination of adverse witnesses)"); *State v. Johnson*, 899 P.2d 1050, 1056 (Kan. 1995) ("The choice of procedure to help a hearing-impaired defendant rests in the sound discretion of the trial court. The ultimate consideration is whether the defendant's constitutional rights to confrontation, to be present, and to a fair trial were preserved."); *Shook v. State*, 552 So. 2d 841, 845 (Miss. 1989) ("In a case of this character, one where the defendant is suffering from the serious handicap of deafness, the court should exercise great care to see to it that the defendant is accorded his constitutional rights. The trial judge, on the scene and observing the defendant and the witnesses, must be allowed considerable discretion, and where it is apparent that the judge has demonstrated an awareness of the issues involved and concern for the protection of the rights of the defendant, as here, his judgment must be accorded great weight and respect by this Court."); *People ex rel. Myers v. Briggs*, 263 N.E.2d 109, 113 (Ill. 1970) ("If [the defendant] is deaf, such opportunity as may be necessary should be allowed for communication to him of the testimony of the witnesses to insure him a full and fair exercise of his legal rights. The exact  manner in which this result should be arrived at must depend on the circumstances of the case and, to a considerable extent, be left to the sound discretion of the court."); *People v. Guillory*, 178 Cal. App. 2d 854, 861 (1960) (trial court "cannot restore . . . hearing to the deaf . . . . He need only give such aid to intelligent appreciation of the proceeding as a sound discretion may suggest"). *See also* Fleming, *supra* note 8, at § 82 (collecting federal and state case–most dealing with foreign language interpretation–that have "held or recognized that decisions regarding arrangements for the delivery of interpretive services . . . are generally within the presiding judge's discretion").

impaired defendant truly comprehends what is spoken is more art than science.[24]

A trial court should not be reversed absent a clear abuse of discretion, that is, only when his ruling lies outside the zone of reasonable disagreement.[25] The ultimate question is whether any inadequacy in the interpretation made the trial "fundamentally unfair."[26] With that general background, we turn to the trial court's exercise of discretion in this case.

**III.**

The court of appeals correctly set out the trial court's duty upon learning that appellant was deaf: Once the disability is fully exposed, as it was in this case, the trial court is responsible for taking whatever steps are necessary to ensure minimum understanding.[27] It also correctly stated what minimum understanding means: The Constitution requires that a defendant sufficiently understand the proceedings against him such that he is able to assist in his own defense.[28] The court then stated that, because the Constitution contemplates more than just a "post hoc" understanding of trial proceedings, "in dealing with a deaf defendant, the true measurement of 'understanding' must occur at the time live testimony is given."[29]

---

[24] Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge*? 26 ARIZ. ST. L.J. 163, 180 (1994).

[25] *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

[26] *United States v. Huang,* 960 F.2d 1128, 1136 (2d Cir.1992) ("the ultimate question is whether the translator's performance has rendered the trial fundamentally unfair").

[27] *Linton*, 246 S.W.2d at 702.

[28] *Id.* at 703.

[29] *Id.*

Here, the court noted, this instantaneous understanding did not take place because the English-based transliteration did not account for appellant's low-level comprehension of English, and the third interpreter was allowed to explain legal and factual concepts only during breaks.[30] Further, the court held that this understanding could have taken place if the trial court had exercised the viable option of providing appellant with the assistance of a deaf-relay interpreter.[31]

The court of appeals relied, in part, on the trial court's statement that the table interpreter could explain things to appellant, "not simultaneous to the interpreting of the interpreters, but at the time that the Court takes its breaks."[32] Here the court of appeals erred. First, "simultaneous interpretation is not always the gold standard," especially when the defendant is, as in this case, linguistically deficient and in need of having concepts explained

---

[30] *Id.* There was no contention that the transliteration was not itself simultaneous, continuous, or literal.

[31] The parties disagree on whether the trial court was adequately notified about the translation problems and need for a deaf-relay interpreter. The State asserts that "appellant never asked the trial court to appoint a deaf relay interpreter until the hearing on her motion for new trial." Brief for the State at x. At the motion for mistrial hearing, when the trial court said she would appoint a table interpreter, counsel said he could "live with that." But after Dr. Andrews testified about the need for a deaf interpreter, counsel objected to proceeding (presumably without a deaf-relay interpreter). Regardless, the question for the court of appeals was whether the appellant provided an appellate record establishing that the trial judge abused her discretion in denying the motion for new trial. *State v. Herndon*, 215 S.W.3d 901, 906 (Tex. Crim. App. 2007); *State v. Gonzalez,* 855 S.W.2d 692, 695-96 (Tex. Crim. App. 1993).

[32] *Linton*, 246 S.W.3d at 703-04 ("Rather than address Linton's inability to understand the immediate flow of information, the trial court merely appointed a second standard interpreter to assist Linton during breaks.").

to her.[33]  This explanative function belongs to the attorney who normally explains legal

concepts and the significance of the facts to his client (whether impaired or not)  before trial

or during breaks.  Second, even if simultaneous interpretation and explanation were the gold

standard,  the reviewing court must determine whether that (or any other) inadequacy in the

interpretation made the trial fundamentally unfair by denying the defendant due process.

In this context, the Seventh Circuit stated that "a defendant in a criminal proceeding

is denied due process when: (1) what is told him is incomprehensible; (2) the accuracy and

scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the

proceeding is not explained to him in a manner designed to insure his full comprehension;

or (4) a credible claim of incapacity to understand due to language difficulty is made and the

district court fails to review the evidence and make appropriate findings of fact."[34]

The State points to the following facts to support the trial court's implicit finding that,

with the interpreters provided, appellant adequately understood the trial proceedings:

- At the hearing on the motion to suppress, appellant testified rationally and often answered questions orally before the interpreter translated;

---

[33] LaVigne and Vernon, *supra* note 5, at 883 ("the requirement of simultaneous interpretation is often in direct conflict with the communication needs of many deaf people in the legal system and often inflicts a distinct hardship. The language of the courtroom is so far beyond the range of linguistically deficient deaf and hard-of-hearing people that we cannot possibly expect an interpreter to keep pace with the spoken language without sacrificing comprehension. Simultaneous interpretation has also been associated with a high rate of interpreter error, which further increases the potential for miscommunication and confusion. While simultaneous interpretation will be appropriate in certain situations, its limitations and its effects on the quality of interpretation should be carefully weighed.") (footnotes omitted).

[34] *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985).

- Appellant spontaneously participated during that hearing;

- The station-house videotape reflects that appellant understood her right to refuse a breath test and was able to communicate with Deputy Woodrick;[35]

- The interpreter, after voir dire, testified that he used a mixture of ASL and transliteration because that is how she communicated with him, and he said that she had not indicated that she was having any trouble;

- At the motion for mistrial hearing, both appellant's pastor and Dr. Andrews testified that they communicated with appellant by using a mixture of ASL and transliteration, just as the court interpreters were using;

- The trial court appointed a table interpreter to "break things down" during trial breaks, and said he would give breaks when they were needed. Counsel said "I can live with that," but never requested any such breaks;

- Neither appellant nor her counsel (or the interpreters) alerted the trial judge to any further difficulties or testified at the motion for new trial hearing about additional specific misunderstandings; and

- Appellant had a coherent exchange with the trial court after the motion for new trial hearing.

We add to that list: This was not a complicated case, it was a simple DWI trial. The level of linguistic competency necessary to participate in one's defense is directly related to the complexity, both factually and legally, of the case. Here, the facts and the law were not complicated: There was no traffic stop to contest, as appellant caused an accident and

---

[35] We have reviewed the videotape and agree with this characterization. Appellant was not shy about getting Office Woodrick's attention and asking him questions when she did not understand something. When she did that, he would write her a note, and she would express that she understood. The clearest example of this is when she told the deputy that she did not know what the word "request" meant. He stated out loud–to no avail–that it means "ask" or "ask for" and he then wrote that down on a piece of paper. She read the note, acknowledged that she understood, and then went back to reading the DIC-24 form.

remained at the scene, exchanging information with the accident victim.   The issue in this case was whether appellant could communicate with Deputy Woodrick well enough to understand her *Miranda* rights and her right to refuse to give a breath sample.  As the State notes, appellant herself effectively testified–through the ASL interpreter–to these matters at the motion to suppress:

Q:    Please state your name for the record.
A:    My name is Audrey Linton.
Q:    And you are the Audrey Linton that's currently charged with a DWI in this case today?
A:    Yes.
Q:    Okay.  And you were arrested on or about November 17th 2003.
A:    Yes.
Q:    The night you were arrested, do you remember giving a breath specimen?
A:    Yes.
Q:    When you gave your breath specimen, were you informed of your right to refuse to take–to give the breath specimen?
A:    I didn't know about that.  I thought it was a requirement that I had to.
Q:    Were you able to communicate with the officer?
A:    No.
Q:    Did you–did he give you anything that you could read personally?
A:    He gave me a paper, but I didn't understand the language.
Q:    Can you describe what the paper looked like?
A:    It was a little note.  A small note.
Q:    Okay.  Was that the only thing you received?
A:    Yes.
Q:    At the time you took–you gave the breath specimen, just so we're clear, did you feel that you had no other choice but to give the breath specimen?
A:    Yes.  I felt I had to.  I didn't know.  I thought it was a requirement.  I felt I had to.

In this colloquy, appellant does not appear to be "linguistically incompetent." Appellant cogently testified to her legal contention–she did not understand her *Miranda* rights or her right to refuse a breath test–but the trial judge, based upon all of the evidence,

rejected that claim.  Appellant fully presented it, but both the pretrial and trial judges acted within their discretion in declining to credit it.[36]

Direct exchanges with the trial judge also reflected appellant's ability to communicate effectively.  First, at the motion to suppress hearing, appellant testified to her background information coherently and without difficulty.[37]  And second, after the trial judge denied the

---

[36] *See, e.g., Nathan v. Municipality of Anchorage*, 955 P.2d 528, 531 (Alaska Ct. App. 1998) (upholding trial court's ruling that deaf defendant adequately understood his right to an independent blood test when under arrest for D.W.I.; although testimony was conflicting on this issue, trial judge had a reasonable basis for concluding that defendant's ability to read and write–albeit at a fourth grade level–as well as his ability to obtain a driver's license and to work at a job sufficed to ensure that defendant could intelligently waive his right to an independent test; "On this issue of historical fact, we must affirm the trial judge's ruling unless it is shown to be clearly erroneous.").

[37] The trial court asked her basic questions:

Q.    What school system did you attend.
A.    Oak Ridge High School
Q.    Oak Ridge High School?
A.    Yes.
Q.    What year would have been your graduating class or when did you graduate from - -
A.    2001.
Q.    Did you ever have training in deaf education in school?
A.    Yes.
Q.    So do you know Ms. Sally Keeshan Maxwell, Sally Maxwell?
A.    Yes.
Q.    You do?
A.    I do.
Q.    And did you learn how to read and write?
A.    High school did not teach me well, no, sir
Q.    Did she learn how to read and write?  Did you learn how to read and write?
A.    No, sir.  Not really.
Q.    Do you write letters?
A.    I write.  I can write, yes, sir, but people don't understand the language how I write.
Q.    Do you ever read books?
A.    I do.  I read books, but I would always ask the teacher what the words mean.
Q.    Do you have a driver's license?

motion for new trial, she explained why the interlock device on her car had recently registered a high level of alcohol around 3:00 in the morning.[38] These exchanges suggest that appellant's understanding was not, as the court of appeals put it, unconstitutionally "post

---

A.    It's in my car.  Yes, I have one.
Q.    Did you have to pass a driving test to get your license?
A.    Yes.
Q.    What sort of occupation have you had since high school?
A.    I'm in college.
Q.    In college?
A.    Yes, sir.
Q.    What type of classes?
A.    I took reading, writing and english.
Q.    What college?
A.    Blinn by Texas A&M.

[38] The trial court first addressed defense counsel, then appellant:
Q.    Okay.  Ms. Linton, do you understand what I'm asking of your attorney.
A.    That was my boyfriend.  It wasn't mine.
Q.    It was brought to my attention that she explained to the probation officer that it was her boyfriend who blew into the device; is that correct.
A.    That's correct.
Q.    Okay.  And, but this was like at 3:00 o'clock in the morning; is that correct?
A.    Yes.
Q.    Okay.  Had he in fact been drinking?
A.    I was sleeping.  And he thought he was playing with a game.  Then I woke up, and I saw him and I told him it wasn't a game.
Q.    Okay.  I understand that then someone blew into the device like ten minutes later or so.
A.    That was me.
Q.    And then the vehicle did start?  It's just of some concern to the Court.  Maybe I think it was recommended that maybe you need a new boyfriend or something.  I'm not telling you that, but please be careful of the people that you associate with.
A.    I told him it's not a game, and he needs to learn not to use my vehicle and not to blow into the device.
Q.    Okay.  All right.
At oral argument before this Court, defense counsel stated that he had an "immense conversation" with appellant before they went in to talk to the court–prepping her for this exchange.  Defense counsel always has the obligation to explain legal and factual concepts to his client in advance of any trial proceeding.  That is counsel's duty, not the duty of an interpreter.

hoc" rather than contemporaneous.[39]  Nor is this a case in which the interpreters themselves

said that they did not know what language the defendant was speaking.[40]  In this case the

interpreters' testimony shows that they used the same "language" that she used to

communicate with them:

> This young lady doesn't appear to know American Sign Language.  So the more we talked–she knows American Sign Language vocabulary to a point.  And when she responds to me, she talks and signs more in English word order, so that is what we're calling sign supported speech.  If you want to call it that, but we try to find a happy way of getting together.  I have told the Judge as well that I have asked a few times was there understanding, was I going too fast.  Was I clear with articulation of signs, was my mouth okay.  That kind of thing.  And she said everything is fine.  She asked me one time what a sign meant.  Other than that, she hasn't indicated anything different.
> ***
> What she signs to me, I sign back in a way that is more like signed English because that's what she is using, so I am matching the mode of communication she's chosen.  But I am not going to be able to say that she understands it.
> ***
> I even asked do you want to slow down.  She never said no, so.

Dr. Andrews testified that, in her opinion, appellant did not understand 20 to 25% of

the words.  The trial judge was not required to accept her opinion.  Even so, 100%

---

[39] *Linton*, 246 S.W.3d at 703.

[40] *Compare Kelly v. State*, 118 So. 1 (Fla. 1928).  In that case, the defendant (as best the trial court could tell) spoke "the Spanish language, or such Spanish as is currently spoken in Cuba, or by the Cuban population in Key West and Tampa." *Id.* at 3.  The trial court therefore called in "Two boys . . . who testified that they were familiar with the Spanish or Cuban language." One of them testified, "I have tried to talk to this defendant in these different languages . . . he didn't understand any of them."  The other boy stated: "I don't know what language he understands."  *Id.* at 2-3.  Not surprisingly, the Florida Supreme Court reversed and remanded for a new trial.

comprehension is the goal–not the constitutional requirement.[41]

Thus, in keeping with the notion that the question on appeal is whether the defendant received due process rather than a perfect translation, American courts have held that a defendant received a fair trial even when there were glitches in the signing;[42] no interpreter was provided for "big" words;[43] the interpretation was not continuous;[44] the interpreter was not personal to the defendant;[45] the translation was in Spanish instead of Quiche,[46] French instead of the African dialect of Djerma,[47] a northern dialect of Haitian Creole instead of a southern dialect,[48] Navajo, but not of the Alamo reservation,[49] or Spanish instead of

---

[41] Amici argue that this does not mean that appellant had 80% comprehension because the words missed are the "content" words. Brief for Advocacy, Inc. et al. as Amici Curiae Supporting Appellant, at 3. Of course, full comprehension is not a realistic goal for any defendant, hearing-impaired or not. A study tracking the prison education experiences of 32,020 inmates released from Texas prisons in fiscal years 1997 and 1998 showed that "44% (10,485) were functionally illiterate (functioning at less than a 6th grade level). . . . Of the functionally illiterate inmates, 36% (3,774) were nonreaders (functioning at less than a 4th grade reading level)." TONY FABELO, EDUCATIONAL ACHIEVEMENT OF INMATES IN THE WINDHAM SCHOOL DISTRICT, Criminal Justice Policy Council I (2000).

[42] *State v. Tok*, 945 A.2d 558, 567 (Conn. App. Ct. 2008).

[43] *State v. Hernandez*, 820 P.2d 380, 383 (Idaho Ct. App. 1991) .

[44] *United States v. Joshi*, 896 F.2d 1303, 1309 & n.6 (11th Cir. 1990).

[45] *State v. Nguyen*, 185 P.3d 368, 373-74 (N.M. Ct. App. 2008).

[46] *People v. Warcha*, 792 N.Y.S.2d 627, 628-29 (N.Y. App. Div. 2005) .

[47] *Gado v. State*, 882 N.E.2d 827, 831 (Ind. Ct. App. 2008).

[48] *State v. Jeudis*, 772 A.2d 715, 719 (Conn. App. Ct. 2001).

[49] *State v. Guerro*, 974 P.2d 669, 674 (N.M. Ct. App. 1998).

Portuguese.[50]   In these cases, the courts acknowledged that the defendant may not have received "the best" interpretive service, but "the best" is not constitutionally required unless the defendant also shows that, without it, he was unable to understand the nature and objective of the proceedings against him and to assist in his own defense.[51]

The same is true here.  We might agree that a deaf-relay interpreter would have been "the best" service provider.  But here, where the record shows that appellant responded coherently and cogently to questions asked (sometimes verbally, before the translation), graduated from high school and was admitted to a college (although she failed her college courses), could understand sufficient English to obtain a driver's license, could communicate sufficiently with her accident victim to exchange pertinent information, and could follow Deputy Woodrick's instructions, the trial court did not abuse its discretion in denying appellant's motion for new trial.

This is not an instance in which the trial judge did not understand or appreciate the defendant's communication problem.  The record is replete with instances in which both the pre-trial and trial judges stopped the proceedings to inquire into appellant's understanding,

---

[50] *Costa v. Williams*, 830 F. Supp. 223, 224-26 (S.D.N.Y. 1993).

[51] In *State v. Ramirez-Dominguez*, 165 P.3d 391 (Wash. Ct. App. 2007), for example, the defendant–an illiterate field worker–was convicted in a bench trial.  On appeal, he challenged the adequacy of the interpretation, which was in Spanish instead of his native Mixteco language. The trial court made a finding that any "[p]roblems with Spanish conjugation or syntax don't impact the substantive content of that statement or make the substantive content of it any less reliable." *Id*. at 398.  The court of appeals, reviewing the appointment of the Spanish interpreter for an abuse of discretion, held that the defendant's right to a fair trial was protected by the Spanish interpretation:  "Given Ramirez-Dominguez's illiteracy and the fact that Spanish was his second language, his responses to the questions were in context and appropriate." *Id.* at 398-99.

to provide additional resources and services, and to offer additional time for appellant to consult with her attorney and her interpreters.

In this case, the record reflects that appellant understood the proceedings well enough to assist in her own defense; moreover, whatever communication difficulties might have existed between appellant and her trial counsel were not apparent in the record. The record reflects that the defense thoroughly and competently challenged every aspect of the State's case. Appellant failed to set out, at the motion for new trial hearing, any specific instances in which (1) she failed to understand crucial testimony during the trial, or (2) she was not able to communicate adequately with her counsel during the trial or how either of those failures led to a fundamentally unfair trial and a violation of her due-process rights.[52] Although the court of appeals may be right that a deaf-relay interpreter could have been "the best" solution to appellant's lack of hearing, it erred in concluding that the three interpreters that the trial judge did use were constitutionally insufficient to ensure her due process rights.

We therefore reverse the judgment of the court of appeals and remand the case to that court to address appellant's remaining points of error.

---

[52] *See, e.g., Montoya v. State*, 811 S.W.2d 671, 673 (Tex. App.—Corpus Christi 1991, no pet.) (Spanish-speaking defendant who failed to direct reviewing court "to any part of the record where alleged errors in translation occurred which prevented him from confronting the witnesses" waived his right to complain of the use of a bailiff as a translator); *Frescas v. State*, 636 S.W.2d 516, 518 (Tex. App.—El Paso 1982, no pet.) (non-English-speaking defendant did not establish harm where he failed to show, from the record, specific misunderstandings or inability to confront a witness).

Delivered: January 14, 2009

Publish