**Audrey R. LINTON, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 13–05–00668–CR.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Aug. 16, 2007.

Rehearing Overruled Feb. 14, 2008.

---

Douglas L. Wilder, The Wilder, Dallas, for appellant.

Gail Kikawa McConnell, Asst. Dist. Atty., Michael A. McDougal, Dist. Atty., Conroe, for appellee.

Beth Mitchell, Lucy D. Wood, Advocacy, Inc., Austin, Marc C. Charmatz, National Assoc. of the Deaf Law & Advocacy Center, Silver Spring, for amicus curiae.

Before Chief Justice VALDEZ and Justices BENAVIDES and VELA.

## OPINION

Opinion by Chief Justice VALDEZ.

Appellant, Audrey Linton, appeals from her conviction for driving while intoxicated. *See* Tex. Pen.Code Ann. § 49.04 (Vernon 2006). She asserts, *inter alia,* that the trial court erred in not making proper accommodations for her hearing impairment.[1] Specifically, Linton contends that in failing to make proper accommodations, the trial court violated section 38.31 of the Texas Code of Criminal Procedure and denied her the right to confront and cross-

---

1. Audrey also asserts (1) an ineffective assistance of counsel argument, and (2) that the trial court erred in denying an evidentiary hearing on her amended motion to suppress.

examine witnesses, pursuant to both the United States and Texas Constitutions. U.S. Const. amends. VI and XIV; Tex. Const. art. I, § 10; Tex.Code.Crim. Proc. Ann. art. 38.31 (Vernon Supp.2006). We reverse and remand.

## I. Background

Linton was arrested on November 17, 2003 on suspicion of driving while intoxicated. The State filed its complaint against her on December 31. On July 22, 2004, the trial court held a hearing on a motion to suppress filed by Audrey's then court-appointed counsel.[2] Linton testified at the hearing, by use of a single interpreter, that she never learned to read or write the English language and, therefore, was unable to communicate with the arresting officer.[3] The trial court denied the motion to suppress without inquiry into Linton's level of comprehension. Trial began on May 23, 2005.

On the morning of trial, Linton urged an amended motion to suppress. In support of her motion, Linton filed a letter from her physician and school records indicating that she reads at a fourth grade level. Linton also urged the trial court to hear expert testimony so that her level of comprehension could be adequately evaluated. The motion was denied.

The extent of Linton's hearing impairment was first made apparent by court-appointed interpreter, Charles Trevino.

On the record, Trevino stated that Linton "does not appear to know American Sign Language." Defense counsel then questioned Linton's ability to understand the proceedings against her and again urged the trial court to hear expert testimony regarding Linton's level of comprehension. The court declined to do so.

Just prior to the jury entering the courtroom, Trevino again expressed his concern about Linton's limited language capacity. He clarified that he was not interpreting but was instead "transliterating" the proceedings for Linton.[4] Trevino also stopped short of stating that transliteration would ensure adequate understanding. Linton once again raised her "linguistic incompetence." The court reasoned, however, that any burden of ensuring adequate understanding should fall on defense counsel. The trial proceeded with a single interpreter.

On the second day of trial, Linton made an oral motion for mistrial based on the competency issue. The trial court agreed to conduct an informal inquiry into the issue of competence during which it permitted two witnesses to be called outside the jury's presence.

Pastor Arthur Craig testified that he had been signing for thirty years and had known Linton for eleven or twelve years. He stated that Linton does not understand American Sign Language or straight En-

---

**2.** A motion to substitute counsel was filed on November 23, 2004.

**3.** The record of this hearing indicates that Linton's testimony was brief and that most of her responses to questions posed were inaudible.

**4.** Specifically, Mr. Trevino made the following observation:

What I'm trying to get clarification, first of all, in our business, there are two ways of rendering the message. One is called tran-

sliteration. One is called interpreting. I have to then go on the record and say that this is transliteration than interpreting. And that what they will be videoing will be the approximation of English on the lips and English and ASL vocabulary, hopefully, at the same time and meaningful. It is not a perfect transliteration. It is not a perfect translation. Okay. And the nature of the beast of transliteration is never going to be as good as interpreting between two languages. So long as that is understood.

glish coding. He testified that following the first day of the proceedings, Linton mentioned to him that she was confused and was not understanding the signs that were being used.

Defense counsel also elicited expert testimony from Jean Andrews, Ph.D.[5] Andrews testified that Linton reads at a fourth grade level. She further stated that about twenty percent of what had been communicated to Linton in the proceedings through the appointed interpreter's transliteration was finger spelling above Linton's level of reading comprehension. She concluded that, given her assessment of Linton and her observation of the signing in the courtroom, the delivery of literal transliteration was insufficient for effective communication with Linton. Andrews specifically stated that Linton had language skills insufficient to enable her to understand and know what was going on in the proceedings and insufficient to enable her to communicate effectively with counsel. She determined that Linton would be able to comprehend the proceedings and consult with counsel if the court would provide a deaf relay interpreter that would work alongside the hearing interpreter.

Following Andrews's testimony, the court appointed an interpreter to sit at the defense table, where she would be "allowed to break down anything to the level at which [Linton] can understand." The court noted that "this will be done, not simultaneous to the interpreting of the interpreters, but at the time that the court takes breaks."

Defense counsel's motion for mistrial was ultimately denied. The case proceeded with the interpreters attempting only to transliterate for Linton and an additional interpreter seated at the defense table in order to facilitate communication between counsel and Linton during trial breaks.

## II. Proper Accommodation

In her third issue, Linton contends that the trial court erred in not making proper accommodations for her hearing impairment and thus denied her the right to confront and cross-examine witnesses, pursuant to both the United States and Texas Constitutions. *See* U.S. Const. amends. VI and XIV; Tex. Const. art. I, § 10.

### 1. Applicable Law

Article 38.31 of the Texas Code of Criminal Procedure governs the appointment of qualified interpreters for deaf defendants and witnesses in criminal proceedings. *See* Tex.Code.Crim. Proc. Ann. art. 38.31 (Vernon Supp.2006). It provides:

> If the court is notified by a party that the defendant is deaf and will be present at an arraignment, hearing, examining trial, or trial, or that a witness is deaf and will be called at a hearing, examining trial, or trial, the court shall appoint a qualified interpreter to interpret the proceedings in any language that the deaf person can understand, including but not limited to sign language.

*Id.*

▊▊▊▊ Article 38.31 implements the constitutional right to confrontation, which includes the right to have trial proceedings presented in a way that the accused can understand. *Salazar v. State,* 93 S.W.3d

5. The record indicates that Dr. Jean Andrews is the Director of Graduate Programs in Deaf Education at Lamar University in Beaumont, Texas. She holds a Ph.D. in speech and hearing sciences from the University of Illinois and a minor in linguistics and literacy. She testified that she has extensive experience in conducting communication assessments on ASL, lip reading, speech, reading, and writing skills of different deaf adults.

339, 340 (Tex.App.-Texarkana 2002, pet. ref'd, untimely filed). The Texas Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. *See* Tex. Const. art. I, § 10. Ensuring that the defendant has that minimum understanding is primarily the task of the trial judge. *Salazar*, 93 S.W.3d at 341 n. 1 (citing *Lincoln v. State*, 999 S.W.2d 806, 806 (Tex.App.-Austin 1999, no pet.)). If a hearing impaired defendant is unable to understand sign language, the court has an obligation to fashion a remedy suitable to overcome the defendant's disability. *Lincoln*, 999 S.W.2d at 809; *Adams v. State*, 749 S.W.2d 635, 639 (Tex.App.-Houston [1st Dist.] 1988, pet. ref'd). Thus, the focus of our inquiry is whether the trial court took adequate steps to ensure that Linton had a minimum understanding of the proceedings.

## 2. Analysis

As noted above, a trial court has an obligation outside of article 38.31 of the Texas Code of Criminal Procedure to fashion a remedy suitable to overcome a particular defendant's disability.[6] *See Lincoln*, 999 S.W.2d at 809. In most instances, a suitable remedy will be readily apparent from the nature of the disability itself. For example, in *Adams*, the court found that the appointment of a stenographer for a deaf defendant who neither understood sign language nor read lips, but who had a high proficiency in the English language, would ensure adequate understanding. *Adams*, 749 S.W.2d at 639. In other instances, the remedy will not be as apparent. Under certain circumstances it will be necessary for a trial court to inquire further in order to expose the true nature of the disability. Linton, for example, is hearing impaired. Her disability, however, is much more complex.[7]

Linton is "pre-lingually deaf;" she became deaf at sixteen months old, well before she could develop comprehension of the English language. She reads at a fourth-grade level and is unable to commu-

---

**6.** The Attorney General of Texas has opined that article 38.31 obligates a trial court

> to explore alternative methods of communication that are appropriate for each person ... Such alternative methods may, for instance, include the use of sign language, finger spelling, lip reading, written communication, or stenographers to provide simultaneous transcriptions, or a combination of these methods, depending a person's proficiency in the different systems of communication.

Op. Tex. Att'y. Gen. No. JM–113 (1983).

**7.** Indeed, we distinguish this case from other appellate court decisions that have dealt with the issue of a deaf defendant. Each appellate court that has addressed the issue has done so in the context of a deaf defendant who has no knowledge of sign language but has the ability to thoroughly read or speak English. *See Salazar v. State*, 93 S.W.3d 339, 341 (Tex. App.-Texarkana 2002, pet.ref'd untimely filed) (defendant was born without one eardrum and was partially deaf in other ear but was otherwise able to address and respond to the trial court or counsel "indicating that he heard and understood what was said."); *Lincoln v. State*, 999 S.W.2d 806, 809 (Tex.App.-Austin 1999, no pet.) (defendant who suffered from a ringing in the ear that "comes and goes" was not considered deaf and otherwise able to address and respond appropriately); *Brazell v. State*, 828 S.W.2d 580, 581 (Tex. App.-Austin 1992, pet. ref'd) (deaf defendant did not understand sign language and was unable to read lips but was otherwise able to read the simultaneous translation of the reporter's shorthand); *Adams v. State*, 749 S.W.2d 635, 636 (Tex.App.–Houston [1st Dist.] 1988, pet. ref'd) (deaf defendant was unable to understand sign language but was otherwise able to speak and read English "very well."). In each case, there was no issue raised as to the defendant's ability to either comprehend, or communicate through, the English language.

nicate by voice. Linton also does not fully understand American Sign Language. Thus, as the record indicates, her form of communication lies somewhere between coded English and ASL. Once the disability is fully exposed, as it was in this case, the responsibility falls to the trial court to take whatever steps are necessary to insure minimum understanding.

It was first brought to the court's attention by the interpreters that Linton was having difficulty communicating. Rather than try to communicate through standard sign language, the court interpreter chose to transliterate the proceedings.[8] According to Andrews, Linton was provided with a very "English based" interpretation. Given Linton's low level of English comprehension, it is difficult to ascertain, based on the transliteration alone, whether Linton understood what was occurring in the courtroom. To remedy this possibility, the trial court chose to appoint an additional interpreter to sit at the defense table, so that difficult concepts could be broken down to a level that she could understand. The trial court insisted, however, that this occur during breaks in the

trial. The State asserts that this accommodation was sufficient to provide Linton with the minimum understanding necessary. We disagree.

■■■ The Constitution requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. *Lincoln*, 999 S.W.2d at 809. Surely, the Constitution contemplates more than just a *post hoc* understanding of trial proceedings. A defendant's inability to simultaneously understand testimony being given would undoubtedly limit an attorney's effectiveness, especially on cross-examination. To be sure, being able to observe but not comprehend the very process that has placed a criminal defendant's freedom in jeopardy is quite troubling. Thus, for this Court, in dealing with a deaf defendant, the true measurement of "understanding" must occur at the time live testimony is given.

In the case at bar, the trial court had notice of Linton's low level of English comprehension and her inability to thoroughly understand ASL.[9] Rather than address

---

8. On defining transliteration, one commentator has made the following observation:

> The role of the interpreter for the deaf is probably easiest to understand if we begin at the English end of the spectrum. The most English form of interpretation is known as transliteration. Transliteration is the means by which spoken English is converted word for word into visual English. Transliteration conveys the words being spoken. It does not decode the spoken English-that is, it does not get to the meaning. Rather, it recodes the English, making the spoken word visible, either in signed form or orally. Oral transliteration is a type of interpretation in which the interpreter repeats the words of the speaker verbatim. Signed transliteration utilizes manually coded English and reproduces the words via hand signs and finger-spelling. Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and*

*Due Process*, 2003 Wisc. L.Rev. 843, 870–71 (2003).

9. On this point, its been noted that:

> Deaf and hard-of-hearing people are hit particularly hard by the vocabulary of English. The English vocabulary of an average deaf fifteen-year-old is nowhere near that of a hearing nine-year-old and, unlike the vocabulary of the nine-year-old, will probably not improve significantly. Simply put, many deaf people do not understand the words we are using, even if the words are put into a visible form by writing of finger-spelling. In fact, many relatively educated deaf people will not recognize English words that are known by uneducated, functionally illiterate hearing people. In a word-based adversarial arena like the courtroom, the inability to cope with the vocabulary can be disastrous if the appropriate accommodations are not made.

Linton's inability to understand the immediate flow of information, the trial court merely appointed a second standard interpreter to assist Linton during breaks. Nothing in the record indicates how this second interpreter "broke down" difficult concepts for Linton, nor does the record indicate that the second interpreter was successful in her attempt. On the contrary, Andrews testified that based on her (1) pre/post-trial evaluation of Linton, (2) observation of the trial proceedings, and (3) the type of transliteration utilized by the court appointed interpreters, she was of the opinion that Linton did not understand what was occurring in the courtroom. We agree.

■ Based on the record as provided, and under the circumstances of this case only, we find that the appointment of an additional interpreter to break down concepts during breaks in trial was insufficient to provide Linton with a thorough understanding of the proceedings against her. Moreover, given that the English based transliteration did not account for Linton's low level comprehension of the English language, we find that the transliteration provided was also inadequate. As one commentator has noted:

> Meaningful communication, with or without an interpreter, requires language and background information with which to share meaning. The deaf person with minimal language skills lacks both. Even if the interpreter can find a set of basic signs that the deaf person understands, the deaf person with minimal language skills may still not understand their meaning in the context of the discussion.

Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process,* 2003 Wisc. L.Rev. 843, 870–71 (2003).

The trial court was provided a viable option in order to secure Linton's understanding of the trial proceedings. Andrews testified that the use of a deaf-relay interpreter would provide adequate understanding. Given the complexity of Linton's hearing impairment, we believe that the trial court erred in not providing Linton with the assistance of a deaf-relay interpreter. We sustain appellant's third issue.[10]

### III. Conclusion

We reverse the trial court's judgment and remand for a new trial.

---

*id.* at 856.

10. Our disposition of this issue relieves us from having to address Linton's remaining issues. *See* Tex.R.App. P. 47.1.