Nassirou GADO, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–0706–CR–535.

Court of Appeals of Indiana.

March 24, 2008.

Ellen M. O'Connor, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Nassirou Gado appeals his convictions for Class A felony attempted murder,

Class A felony robbery, and Class B felony criminal confinement. We affirm.

### Issues

The issues before us are:

I. whether the trial court properly conducted Gado's trial without providing an interpreter for his native language, Djerma; and

II. whether the trial court properly admitted evidence found during the search of a room Gado had been occupying.

### Facts

The evidence most favorable to the convictions is that Gado frequently visited a grocery store called Mi Familia in Indianapolis. Maria Espinoza was an employee there. On October 8, 2005, Gado entered Mi Familia as usual and after some time used the restroom. Gado told Espinoza that there was something wrong with the restroom. Espinoza went to check the restroom, saw that the toilet was leaking, and fixed it. As she left the restroom, Gado threw her back into it and began hitting her. Gado bound Espinoza's hands and feet and continued hitting her about the head. He put a plastic bag over Espinoza's head and began hitting her in the head with the toilet tank lid. He barred the door to the restroom with a display case. Espinoza eventually was able to free herself from the restroom. When she did so, she saw Gado heading toward the restroom carrying garbage bags and a circular saw. Espinoza managed to escape from Mi Familia and run to a nearby liquor store, where police were called. Gado had taken $400 and a gold bracelet from Espinoza.

Police located Gado at a nearby apartment complex. He had been staying in an apartment with Rosalind Felemban and her two sons. Felemban had allowed Gado to stay rent-free because he had told

her he was homeless. Gado had been sleeping in a bedroom that one of Felemban's sons had been using. The son's toys were in the room and he frequently went in and out of the room to retrieve toys; there was no lock on the door. Felemban gave consent to police to search the entire apartment, including the room in which Gado had been sleeping. In that room, police found a purse, a cell phone, a wallet, identification papers for Gado, and a bloody t-shirt. On October 12, 2005, the State charged Gado with Class A felony attempted murder, Class A felony robbery, Class B felony criminal confinement, and Class B felony aggravated battery; the State later dismissed the battery charge.

Gado is a native of Niger, Africa. He speaks Djerma, a dialect spoken in Niger. Niger's official language is French. Gado's original trial was scheduled to begin on December 4, 2006. Gado requested the services of a Djerma interpreter for trial. The trial court was unable to procure a certified Djerma interpreter for this trial, but did find two uncertified Djerma speakers who were willing to offer their translation services. However, on December 5, 2006, these persons told the trial court that they had received phone calls threatening "certain repercussions" if they continued translating. Tr. p. 619. The trial court clearly suspected Gado of precipitating these calls. In response to this situation, the trial court declared a mistrial.

On March 28, 2007, the trial court held a hearing at which it noted that it had arranged for the services of a Djerma interpreter through the International Bureau of Translations, but that person had unexpectedly withdrawn their services. It also noted that it had contacted the Niger Embassy in Washington, D.C., but the embassy was unable to assist in finding a Djerma interpreter. The trial court then conduct-

ed a hearing on the extent of Gado's understanding of English. The court recollected that it had conversed with Gado in English in earlier proceedings, or that he had participated in proceedings with the assistance of a French interpreter. Additionally, the State presented the testimony of Felemban, who indicated that she had had numerous, detailed conversations with Gado in English during the three weeks he had stayed at her apartment. It was her understanding that Gado also spoke French. The State also presented evidence that after being arrested, Gado had called Felemban a "sell-out Nigger." *Id.* at 462. At the conclusion of the hearing the trial court stated, "we are either going to proceed with this trial in all English with no interpreter or I will allow the Defendant to have the French interpreter, if that's what he wishes to have." *Id.* at 471–72.

Gado's second trial began on May 14, 2007. At the beginning of trial, the trial court swore in a certified French interpreter for Gado to use as he wished. Gado objected to this procedure and continued to insist that only a Djerma interpreter would be acceptable; Gado himself refused to communicate with the French interpreter. The trial court overruled the objection and proceeded to trial. Gado frequently was disruptive during trial, apparently often making verbal outbursts in Djerma, and eventually was removed from the courtroom for the duration of the trial. The trial court also admitted evidence seized from the bedroom in Felemban's apartment over Gado's objection. On May 15, 2007, the jury convicted Gado as charged. He now appeals.

## Analysis

### I. Need for Djerma Interpreter

Gado first challenges the trial court's decision to proceed with his trial without securing a Djerma interpreter to assist him. Our supreme court recently noted that there are two distinct types of interpreters for criminal proceedings: "defense interpreters" and "proceedings interpreters." *See Arrieta v. State,* 878 N.E.2d 1238, 1242 (Ind.2008). Defense interpreters are for the benefit of non-English speaking defendants; they simultaneously translate English proceedings and assist with attorney-client communications. *Id.* "Proceedings interpreters serve the court by translating the speech of participants at various junctures." *Id.* A defense interpreter, which is what Gado requested here, is " 'necessary to implement fundamental notions of due process such as the right to be present at trial, the right to confront one's accusers, and the right to counsel.' " *Id.* (quoting *Martinez Chavez v. State,* 534 N.E.2d 731, 737 (Ind.1989)). An indigent non-English speaking defendant is entitled to an interpreter at public expense. *Id.* at 1244.

The *Arrieta* court approved of this court's analysis in *Nur v. State,* 869 N.E.2d 472 (Ind.Ct.App.2007), *trans. denied,* of how trial courts should assess the need for an interpreter. *Id.* at 1243. A trial court's decision whether an interpreter is needed should be based on factors such as the defendant's understanding of spoken and written English, the complexity of the proceedings, issues, and testimony, and whether, considering those factors, the defendant will be able to participate effectively in his or her defense. *Nur,* 869 N.E.2d at 479. If the issue of appointing an interpreter is raised at the trial court level, either by the parties or by the court sua sponte, we review the decision whether to appoint an interpreter for an abuse of discretion. *Id.* at 479–80. "An abuse of discretion occurs if a decision is against the logic of the facts and circumstances before the court." *Id.* With respect to the abuse of discretion standard, we give sub-

stantial weight to a trial court's judgment as to the credibility of witnesses based on its observance of evidence first hand. *Pruitt v. State,* 834 N.E.2d 90, 104 (Ind. 2005), *cert. denied.*

Here, the State presented considerable evidence that Gado was being less than candid with the trial court regarding his alleged inability to speak or understand English. The trial court had had interaction with Gado on several occasions that led it to believe he had sufficient command of English. There was evidence that Gado was familiar with English slang terms, such as "sell-out Nigger." Tr. p. 462. Most importantly, Felemban testified to having frequent conversations with Gado in English, lasting an hour or two every day that he lived in her apartment for three weeks. She testified that Gado never seemed to be unable to understand her, and that the topics they discussed included Gado's family, where he had lived, and numerous crimes he had committed, including writing bad checks and stealing a car.

We do not believe a trial court has to accept at face value a defendant's professed lack of understanding of English, anymore than it must accept an assertion of incompetency to stand trial, or must accept in-court disruptiveness as indicative of incompetency. *See Bramley v. State,* 543 N.E.2d 629, 633–34 (Ind.1989) (holding, with respect to competency findings, that a trial court has a duty to ensure "that causes are tried and final determinations made" and that "[i]t would be impossible to accomplish this if a defendant is permitted to purposely frustrate the procedures by disruptive behavior."). The trial court here essentially found that Gado intentionally was attempting to frustrate his

prosecution by faking inability to communicate in any language other than Djerma, a rare language for which it is very difficult to find interpreters. There is evidence in the record to support that conclusion and that Gado adequately understood English, and possibly French, so as to proceed with his trial without the aid of a Djerma interpreter. The trial court was in the best position to judge witness credibility firsthand and decide whether Gado required an interpreter. It did not abuse its discretion in concluding that he did not.

## II. Admission of Evidence

■ Next, Gado challenges the admission of evidence found in the bedroom in Felemban's apartment in which he had been sleeping. "A trial court has broad discretion in ruling on the admissibility of evidence." *Bentley v. State,* 846 N.E.2d 300, 304 (Ind.Ct.App.2006), *trans. denied.* We reverse a ruling on the admissibility of evidence only for an abuse of discretion. *Id.*

■ Felemban gave consent to the police to search the entirety of her apartment. "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph,* 547 U.S. 103, 106, 126 S.Ct. 1515, 1518, 164 L.Ed.2d 208 (2006).[1] There is an exception to this rule; namely, a physically present co-occupant may refuse to consent to the search, which renders the warrantless search unreasonable and invalid as to him or her. *Id.,* 126 S.Ct. at 1519. Gado was not physically present when Felemban

---

1. Gado makes no separate argument that the search violated his rights under the Indiana Constitution.

consented to the search of the apartment, so this exception does not apply. Police are not required to take affirmative steps to find a potentially objecting co-tenant before acting on consent to search that they have already received. *Id.* at 122, 126 S.Ct. at 1527.[2]

Authority to consent to a search can be either apparent or actual. Actual authority requires a sufficient relationship to or mutual use of the property by persons generally having joint access to or control of the property for most purposes. *Halsema v. State,* 823 N.E.2d 668, 677 (Ind.2005). A consenting party with actual authority over property may permit the search in his or her own right; also, a defendant "assume[s] the risk" that a co-occupant might permit a search. *Lee v. State,* 849 N.E.2d 602, 606 (Ind.2006), *cert. denied.*

We conclude Felemban had actual authority over the room in which Gado had been sleeping. Gado was staying at the apartment as Felemban's guest, for free; he was not an official co-tenant of the property. The toys of one of Felemban's sons were in the room, and he would go into the room to retrieve toys. There was no lock on the door. Additionally, by the time Felemban consented to the search, she had already told Gado that he was no longer welcome to stay there, and he had in fact left. Felemban had actual authority to consent to a search of the bedroom.

We also conclude this case is not one in which the police opened a "closed container" of some kind before finding the evidence at issue here. It is true that persons sharing premises may nonetheless retain areas or objects within their exclusive control that are not subject to search based on consent of one of the co-occupants. *Id.* at 607. "A co-occupant may deny joint access over an object by keeping it in a place devoted to the owner's exclusive use or where the object is one over which only one person normally exercises control and authority or which 'normally hold[s] highly personal items.'" *Id.* at 608 (quoting *Krise v. State,* 746 N.E.2d 957, 970 (Ind.2001)). The items here were stuffed between the bed and the wall and were at least partially visible. This is not akin to items in a purse, as was the case in *Krise,* nor to items inside a closed dresser drawer, as was the case in *Halsema.* Police did not have to open any containers to find the items. The items were recovered pursuant to a valid consent to search and the trial court properly admitted them into evidence.

### Conclusion

The trial court did not abuse its discretion in proceeding to trial without obtaining a Djerma interpreter and in admitting items found in Felemban's apartment into evidence. We affirm.

Affirmed.

SHARPNACK, J., and VAIDIK, J., concur.

2. We also reject Gado's apparent argument that Felemban was required to honor his request to help him evade police by denying consent to search on his behalf.