## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 29 2017, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi K. Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D.J., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner.* | September 29, 2017 <br><br> Court of Appeals Case No. <br> 47A05-1705-JV-945 <br><br> Appeal from the Lawrence Circuit Court <br><br> The Honorable Andrea McCord, Judge <br><br> Trial Court Cause No. <br> 47C01-1608-JD-284 |

**Bailey, Judge.**

# Case Summary

D.J. appeals the juvenile court's dispositional order making him a ward of the Indiana Department of Correction ("DOC") rather than placing him in a less restrictive alternative. He raises one issue on appeal, namely, whether the juvenile court abused its discretion when it ordered him placed with the DOC. We affirm.

# Facts and Procedural History

On August 17, 2016, fifteen-year-old D.J. battered his mother, S.J. ("Mother"), by hitting her on her left side three times and on her head twice with a closed fist, causing pain and injury. D.J. had become angry with Mother because she took his X-box gaming system away from him after he had refused to go to school. D.J. took Mother's cellular telephone away from her when she attempted to call the police. Mother fled the house and called the police from a neighbor's house. The police arrived and arrested D.J. At a detention hearing on August 18, the juvenile court found probable cause that D.J. was a delinquent child and ordered him detained and placed with Mother.

The State filed a petition on August 31, alleging that D.J. was a delinquent child for committing battery against Mother[1] and interference with the reporting

---

[1] Ind. Code § 35-42-2-1 (2016).

of a crime,[2] acts that would be a Class A misdemeanors if committed by an adult. On August 23, Lawrence County Probation Officer Constance Bailey ("Bailey") prepared a preliminary inquiry report regarding D.J. in which she noted his juvenile history. Appellant's App. at 9, 11. On July 3, 2013, D.J. had been adjudicated a delinquent child for intimidation where the threat is to commit a forcible felony,[3] and he was placed on a program of informal adjustment from which he was successfully discharged. On March 8, 2016, D.J. was again alleged to be a delinquent child for intimidation, this time for threatening to punch a teacher at his school in Bloomington. However, the juvenile court dismissed the case "as referred out" to the Monroe County Community School Corporation because D.J. had been suspended from his school for the remainder of the school year and was placed on home bound instruction.[4] *Id.* at 42.

[4] The preliminary inquiry report also noted D.J.'s mental health history. D.J. had had several previous placements for mental health treatment beginning in May 2013, when he was diagnosed with Mood Disorder while placed at Bloomington Meadows Hospital ("Meadows"). D.J. was discharged from Meadows that same month with a recommendation to continue medication

---

[2] I.C. § 35-45-2-5.

[3] I.C. § 35-45-2-1(a)(1).

[4] The preliminary inquiry report notes another set of delinquency allegations for acts of resisting law enforcement and disorderly conduct in April 2014, but those allegations were dismissed with prejudice by the prosecutor, and the record does not disclose anything further about the nature of those allegations.

management and counseling. D.J. was again admitted to Meadows on April, 10, 2014. He participated in individual, group, and family psychotherapy, and he was discharged on April 14. In August 2014, D.J. was placed at Harsha Behavioral Center and then Gibault Treatment Facility for six months, and D.J.'s parents reported that they observed an improvement in D.J.'s behavior after his release from Gibault.

[5] According to the preliminary inquiry report, D.J. had reported smoking marijuana twice. The report notes that D.J.'s father, M.J. ("Father"), had a history of marijuana and cocaine use while on probation in 2006 and that he had participated in treatment through Amethyst House.

[6] On October 3, 2016, the juvenile court held a dispositional hearing at which D.J. admitted to the battery allegation, and the State then dismissed the interference with reporting a crime allegation. At the hearing, Bailey and Ashley Bridges ("Bridges"), another Lawrence County Probation Officer who is a case manager with the Lawrence County Juvenile Problem Solving Court ("JPSC"), testified and recommended that D.J. be placed on supervised probation and ordered into the JPSC program.[5] They testified that the JPSC

---

[5] Neither party nor anything in the record explains what a problem solving court is. However, Indiana's judicial branch website, of which we take judicial notice, Ind. Evidence Rule 201(a), describes such courts as being designed

> to accommodate offenders with specific needs and problems that were not or could not be adequately addressed in traditional courts. Problem-solving courts seek to promote outcomes that will benefit not only the offender, but the victim and society as well. Thus problem-solving courts were developed as an innovative response to deal with offenders' problems, including drug abuse, mental illness, and domestic violence.

team had evaluated D.J.'s case, looking at a home study, his Individualized Education Plan ("IEP"), psychological evaluations, and other background information, and had determined that D.J. was appropriate for the JPSC program. They testified that regular juvenile probation would not provide the intensive mental health services D.J. needed, but supervised probation through the JPSC program could provide those services. Bridges also testified that D.J.'s family did not have medical insurance to provide him with the mental health treatment he needed. She testified that D.J. had been out of school since the eighth grade because the school would not allow him to reenroll until he had documentation from a therapist that he did not pose a danger. Bridges testified that the JPSC program could provide D.J. with the therapy necessary to get him "to the point of where he would be allowed to enroll in school." Tr. at 23. She said the JPSC could ensure that D.J. attended school through home bound services until then. However, Bridges testified that Mother was not "super excited" about D.J. being placed in the JPSC program because Mother did not want to take drug screens[6] and she was concerned that the program requirements would interfere with her job.

---

www.in.gov/judiciary/pscourts/2337.htm. Among other differences from other courts, "[p]roblem-solving courts work with external parties to achieve certain goals (e.g., developing partnerships with mental health providers)." *Id.*

[6] Bridges testified that "[t]here was a comment made by the mom that if she wants to get high with her friends, then, you know, she's an adult, she can do that." *Id.* at 26.

[7]     Bridges also testified that there "was an argument for" D.J.'s placement in the DOC. *Id*. at 25. She stated that D.J. could "receive therapy services" and education at the DOC. *Id*.

[8]     Mother testified that she believed she would lose her job as a manager at Burger King if she had to bring D.J. to court every Tuesday afternoon, as required by the Lawrence County JPSC program. However, she stated that she did not "want to see [D.J.] go to DOC for this" delinquent act, *Id*. at 52, and she was "trying to avoid" D.J. being placed in the DOC. *Id*. at 51.

[9]     The State recommended that D.J. be placed in the JPSC program because he needed therapy. If the court did not place D.J. in the JPSC program, the State recommended placement in either a residential treatment facility or the DOC. D.J.'s attorney requested that he be placed in the JPSC program because he needed therapy and there was no evidence regarding what therapy he could receive in the DOC.

[10]    The juvenile court was concerned that Mother would lose her job and be "out on the street" if she was required to participate in D.J.'s JPSC program. *Id*. at 45-46. The court found that D.J. needed "intensive services" that "c[ould] only be provided" by the JPSC program or the DOC. *Id*. at 52-53. However, the court stated that it wished to avoid placing D.J. in the DOC if possible, and noted that placing D.J. in the JPSC program would be less restrictive and "more family-like" than DOC placement because he would be living at home while in the JPSC program. *Id*. at 53. Therefore, the court continued the

dispositional hearing to give the parties time to find an approved adult who could accompany D.J. to court every week as required under the JPSC program.

[11] On February 9, 2017, Bailey prepared and filed with the juvenile court a predispositional report regarding D.J. in which she noted that a December 7, 2016 psychological evaluation of D.J. by Christopher & Associates showed that he had a diagnosis of a moderate "conduct disorder" and "unspecified bipolar and related disorder." Appellant's App. at 47. Christopher & Associates noted that D.J. needed intensive psychotherapy and recommended that he be placed in the JPSC program. The Probation Recommendation section of the predispositional report also recommended that D.J. "be placed on supervised probation, and be ordered into the Lawrence County [JPSC,] to end upon the successful completion of that program." Id. at 53.

[12] On February 17, Bailey filed in the juvenile court a copy of a "Parenting and Family Function Assessment" regarding D.J. and his family, prepared by Ireland Home Based Services. Id. at 70. The assessment recommended that D.J. have individual counseling, preferably in an inpatient setting, and stated that D.J. needed probation intervention through the JPSC. It noted that Mother "could also benefit" from therapeutic and parenting services. Id. at 73.

[13] The juvenile court reconvened the dispositional hearing on March 30, 2017. At that hearing Father testified that, although he lives forty-five minutes away from the court house, he could transport D.J. to the JPSC every other Tuesday.

He was not sure if he could do it every week as he and his wife only had one shared vehicle. He stated that he could also transport D.J. to other appointments if they were scheduled in advance. Father stated that whether he, himself, would participate in counseling depended "on what you're talking about." Tr. at 65. Father said that he would "not tak[e] random drug screens," and that he could not authorize random searches of his residence because he did not own the house in which he lived. *Id*. at 67.

[14] Mother also testified at the March 30 hearing. She testified that she could rearrange her work schedule in order to get D.J. to court weekly, but doing so would lower her work hours, her position, and her income. She stated that such a revised work schedule would cause "an extreme financial hardship on her family," but she would make that change if she had to do so. *Id*. at 69-70. Mother testified that she did not think she "should have to do" counseling through the JPSC program. *Id*. at 70.

[15] Bridges testified again at the March 30 hearing. She testified that "typically" both parents are ordered to participate in the JPSC program, but that there are "some extenuating circumstances." *Id*. at 71. She stated that, since Father lives outside the county and Mother said she would have difficulty participating in the JPSC program, "[i]t would have to be at the court's discretion as far as what level of involvement [D.J.'s parents] would have to play" in the JPSC program. *Id*. at 72. She testified that she still believed that D.J. should be placed in the JPSC program and that the only alternative was, "unfortunately," placement in the DOC because there was no residential placement available. *Id*. at 74.

Bridges also testified that, in recent weeks, D.J. had been "trying and doing everything he c[ould] to be a participant of the [JPSC] program." *Id*. at 72.

[16] At the close of evidence, the State recommended that D.J. be placed in the DOC because "it just sounds like today that the parents are not willing or [are] unable to participate fully in the [JPSC] program so that [D.J.] could be successful." *Id*. at 75. Counsel for D.J. argued that the JPSC program was the only appropriate placement for him and requested that placement.

[17] The juvenile court ruled as follows:

> [B]ased on [the parents'] testimony, they're not going to be compliant with the orders of the Court, which could actually do more harm than good to the child, if that's the case. So, I don't know that I agree that it's necessarily in the best interests for me to put him in a program and place the parents under Court orders, which would be necessary to facilitate the orders of the Court for Problem Solving Court. It's going to cause mom to lose her manager job at work. It's going to cause mom to take a pay rate cut. She's going to lose her manager status at Burger King, is my understanding. Dad lives forty-five (45) minutes away and is only able to be here every other week and he's unwilling to participate in services himself, family-type service, to try to repair the family unit in order to try to get the child back to where he needs to be.
>
> So, the Court is not going to set this young man up to fail. It's not going to happen. So, at this time, the Court finds that it'd be in the best interests of the child to remand the child, order the child, to be made a ward of the Indiana Department of Correction[] for housing in any correctional facility for juveniles. The child is now ordered into [B]oys' [S]chool, effective immediately…. I'm sure that there will be programming at the

Department of Correction[] in which the parents will be required to participate whether you like it or not. But it's very clear to this Court that the parents are not going to work with the program and I am not going to put this boy through that. He does not deserve to have orders that are – that the parents are refusing to comply with at this time. We're going to set this boy up so he gets the best services possible, even if it means to remove him from the community.

*Id*. at 77-78. In its written dispositional order making D.J. a ward of the DOC for housing in a correctional facility for children, the juvenile court stated as follows:

> The child's parents would be required to participate and follow certain rules of the Juvenile Problem Solving Court. After hearing evidence from the parties and from the child's Mother and Father at the dispositional hearing, the Court finds that [] the child's parents are either unable or are unwilling, or both, to follow certain conditions and rules within the Juvenile Problem Solving Court. Both parents testified under oath at the dispositional hearing that they would not comply with certain requirements of the Juvenile Problem Solving Court. As such, there are no other reasonable alternatives to facilitate the child's rehabilitation short of wardship to DOC, based on the child's past history and rehabilitative services provided to him.

Appellant's App. at 75-76. This appeal ensued.

# Discussion and Decision

D.J. contends that the juvenile court erred in making him a ward of the DOC rather than placing him in the less restrictive alternative of supervised probation through the JPSC program.

> [T]he choice of the specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion. The juvenile court's discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom. Hence, the juvenile court is accorded wide latitude and great flexibility in its dealings with juveniles.

*R.A. v. State*, 936 N.E.2d 1289, 1291 (Ind. Ct. App. 2010) (citations and quotations omitted). "With respect to the abuse of discretion standard, we give substantial weight to a trial court's judgment as to the credibility of witnesses based on its observance of evidence first hand." *Gado v. State*, 882 N.E.2d 827, 830-31 (Ind. Ct. App. 2008) (citing *Pruitt v. State*, 834 N.E.2d 90, 104 (Ind.2005)), *trans. denied*.

The statutory considerations are contained in Indiana Code 31-37-18-6:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:

> (A) in the least restrictive (most family like) and most
> appropriate setting available; and

> (B) close to the parents' home, consistent with the best
> interest and special needs of the child;

> (2) least interferes with family autonomy;

> (3) is least disruptive of family life;

> (4) imposes the least restraint on the freedom of the child and the
> child's parent, guardian, or custodian; and

> (5) provides a reasonable opportunity for participation by the
> child's parent, guardian, or custodian.

[20] Thus, Indiana policy favors the least harsh disposition that is consistent with community safety and the best interest of delinquent juveniles. However, in certain circumstances, the best interest of the child will be better served by a more restrictive placement. *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002). The trial court held that this case presents such circumstances, and we cannot say the trial court abused its discretion in so holding.

[21] The trial court based its best interest conclusion on its finding that D.J.'s parents' testimony showed they would refuse to comply with the parental requirements of the less restrictive JPSC program and that their non-compliance would cause D.J. to fail at the program. Father testified that he would not submit to drug screening or house searches, and Mother also indicated

reluctance to submit to drug screening. Both parents also indicated an unwillingness to engage in the family counseling requirements of the JPSC program. And although the parents testified that they would transport D.J. to the JPSC program despite the significant hardship to them, the juvenile court clearly found that testimony was not credible. The juvenile court was in the best position to judge the parents' credibility, and we will not second-guess it on review. *Gado*, 882 N.E.2d at 830-31.

[22] The juvenile court did not abuse its discretion in concluding that it was not in D.J.'s best interest to be set up for failure in the JPSC program due to his parents' likely non-compliance with the requirements of that program. Nor did the court err in concluding that it was in D.J.'s best interest to be placed in the DOC where he could obtain the mental health and education services he needed. Those conclusions were supported by the logic and effect of the facts and circumstances before the court. *R.A.*, 936 N.E.2d at 1291.

# Conclusion

[23] The trial court did not abuse its discretion in concluding that placement in the DOC was in D.J.'s best interest given the evidence of his parents' unwillingness and/or inability to comply with the requirements of the only available less restrictive alternative, i.e., the JPSC program.

[24] We affirm.

Baker, J., and Altice, J., concur.