Opinion issued December 31, 2024



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00442-CR

———————————

**SOSTENES LORENZO TOLENTINO, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 14**
**Harris County, Texas**
**Trial Court Case No. 2306675**

---

## OPINION ON FURTHER REHEARING

Sostenes Lorenzo Tolentino was found guilty of driving while intoxicated. On appeal, Tolentino complains that he could not understand the trial proceedings

because he was not provided with an interpreter in his native language, Nahuatl.[1] Tolentino argues that his rights under the United States and Texas Constitutions to due process and due course of law, confrontation, and counsel were denied; the trial court violated its statutory duty to appoint an interpreter in a language he understands; and the trial court abused its discretion when it denied his motion for new trial.

We issued our memorandum opinion and judgment reversing the trial court's judgment and remanding for a new trial because proceeding with a Spanish interpreter violated Tolentino's right to due process. The State of Texas moved for en banc reconsideration. *See* TEX. R. APP. P. 49.5. On April 23, 2024, we treated the en banc motion as a request for panel rehearing and withdrew our opinion, vacated the judgment, and substituted an opinion and judgment in its stead. The State again moved for en banc reconsideration. Again treating the en banc motion as a request for panel rehearing, we deny rehearing but withdraw our opinion of April 23, 2024, vacate our judgment of the same date, and substitute this opinion and judgment in their stead. The State's motion for en banc reconsideration of our prior opinion is moot.[2]

---

[1]     Nahuatl is an indigenous language spoken in Mexico.

[2]     Because we issue a new opinion, the motion for en banc reconsideration is moot. *See, e.g.*, *Shuman v. Ganley*, No. 01-22-00561-CV, 2023 WL 6627064, at *1 (Tex. App.—Houston [1st Dist.] Oct. 12, 2023, no pet.) (mem. op.) (treating en banc

## Background

In April 2020, Tolentino was near the scene of a separate ongoing DWI investigation. The police questioned Tolentino and then, based on those interactions, arrested him for DWI.

In June 2021, a year before trial, Tolentino's trial counsel moved for appointment of a Nahuatl interpreter. Trial counsel informed the trial court that he communicated with Tolentino through Tolentino's brother, who has a better understanding of Spanish. Tolentino's native language is Nahuatl, and he speaks and understands little Spanish or English. The trial court initially attempted to provide a Nahuatl interpreter but eventually, over Tolentino's objection, appointed a Spanish interpreter for Tolentino and proceeded with trial in June 2022. A jury found Tolentino guilty of DWI, and the trial court sentenced him to one year confinement probated for 15 months of community supervision.

Tolentino moved for a new trial, arguing that his rights under the United States and Texas Constitutions to due process and due course of law, confrontation, and counsel were denied. He also argued that the trial court violated its statutory duty to

_____

motion as request for panel rehearing, withdrawing original opinion and judgment, issuing new opinion and judgment, and dismissing en banc motion as moot); *Poland v. Ott*, 278 S.W.3d 39, 41 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (motion for en banc reconsideration rendered moot by withdrawal and reissuance of opinion and judgment).

3

appoint an interpreter in a language he understands. The trial court denied his motion.

## Due Process

Tolentino argues that his right to due process was violated by the trial court's appointment of a Spanish interpreter instead of a Nahuatl interpreter.

### A. Standard of Review

We review a trial court's decision to appoint an interpreter for an abuse of discretion. *See Balderas v. State*, 517 S.W.3d 756, 777–78 (Tex. Crim. App. 2016). Whether the trial court took adequate steps to ensure that a defendant sufficiently understood the proceedings is also reviewed for an abuse of discretion. *Linton v. State*, 275 S.W.3d 493, 502 (Tex. Crim. App. 2009). We reverse only when the trial court's ruling lies outside the zone of reasonable disagreement. *Id.* at 503; *see also Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (before reviewing court reverses trial court's decision, it must find ruling was so clearly wrong as to lie outside zone within which reasonable people might disagree).

### B. Analysis

The parties do not dispute that Tolentino required an interpreter, only whether a Spanish interpreter satisfied this need. If a defendant cannot understand the proceedings, fundamental fairness and due process require that the court provide an interpreter. *See Linton*, 275 S.W.3d at 500. Whether an accused receives adequate

interpretation is a matter within the trial court's discretion because it depends on "a potpourri of factors." *Id.* "The question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services . . . were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Id.*

The constitutional guarantee of due process "is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). That guarantee encompasses the defendant's rights to confront witnesses against him and assist in his own defense. *See* U.S. CONST. amend. VI; *Chambers*, 410 U.S. at 295; *Pointer v. Texas*, 380 U.S. 400, 405 (1965). While the Constitution does not guarantee every defendant a perfect trial, it requires "that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense." *Ex Parte Cockrell*, 424 S.W.3d 543, 557 (Tex. Crim. App. 2014) (internal quotation omitted). The Court of Criminal Appeals has considered that a defendant is denied due process when

> (1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

*Linton*, 275 S.W.3d at 505 (internal quotation omitted). "The ultimate question is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Id.* at 503.

Tolentino moved for a Nahuatl language interpreter. The trial court stated on the record that it could not "put [Tolentino] to trial without having a qualified interpreter interpreting for him." The trial court acknowledged if it could get a Nahuatl interpreter it would proceed with trial, otherwise it would not. At a later hearing, the trial court acknowledged that Nahuatl interpreters were available, but either they would need an additional interpreter to translate from English to Spanish and then from Spanish to Nahuatl or the English-to-Nahuatl interpreter would have to translate remotely because they were unable to physically attend trial.

A few months later, the trial court told the parties that it would provide a Spanish interpreter instead of a Nahuatl interpreter. The trial court held a pretrial hearing in which the court considered the record from an earlier suppression hearing,[3] including Detective A. Nerio's testimony about video of Tolentino's arrest. Detective Nerio testified that the video captured a "full conversation" he had with

---

[3]     Tolentino moved to suppress any physical evidence, his arrest, his statements, and any recorded communications, arguing that there was no evidence he had operated a motor vehicle. The hearing was not about Tolentino's ability to understand Spanish. Defense counsel waived Tolentino's appearance because there was no interpreter for Tolentino's "particular Aztec dialect."

Tolentino in Spanish. No translation was provided for the audio from the arrest video other than Detective Nerio translating "manejo bien" as "drive well."[4]

The video depicts Detective Nerio approaching Tolentino and shouting "hey" at Tolentino. Detective Nerio, speaking Spanish, then repeatedly asks Tolentino the same question, to which Tolentino responds by grunting before finally giving a one-word response. Detective Nerio then asks a different question repeatedly and Tolentino mumbles unintelligibly. Detective Nerio then repeats the question twice before Tolentino gives a two-word response. Detective Nerio then asks a series of questions to which Tolentino mumbles and points before Detective Nerio asks another question. Tolentino stares blankly for a moment before saying a short phrase and looking away. Detective Nerio asks another question twice before Tolentino gives a two-word response. Detective Nerio spends most of the interaction speaking and repeating questions. Tolentino can be seen staring blankly at Detective Nerio, occasionally grunting, and mumbling short phrases. Detective Nerio then calls Tolentino a "fucker," handcuffs him, and escorts him to the back of his patrol vehicle. Tolentino can be heard mumbling something repeatedly to himself while being handcuffed.

---

[4]     State's Exhibit 2, the video of Tolentino completing field sobriety tests at the police station, was introduced at trial. The video lacks audio. And without audio, the only information the video conveys is Tolentino's ability to mimic the actions demonstrated by the officers to test his sobriety. The video is silent on his ability to understand Spanish.

After opening the back door to his patrol vehicle, Detective Nerio instructs Tolentino in Spanish, but Tolentino does not respond. Detective Nerio turns Tolentino around so his back is facing the interior of the patrol vehicle and he can get inside. Tolentino makes a brief comment to which Detective Nerio responds. Tolentino then repeats a short question to Detective Nerio, which Detective Nerio does not respond to. Then Detective Nerio is seen using his hand to push Tolentino into the vehicle while Tolentino begins repeating an earlier phrase. Detective Nerio ignores Tolentino and lifts Tolentino's leg into the vehicle before closing the door.

The video then briefly depicts Detective Nerio's investigation away from Tolentino before he returns to speak to Tolentino in the back of his vehicle. Detective Nerio and Tolentino then have a broken exchange of repeated questions and short responses for about 30 seconds. Shortly after, Detective Nerio approaches the driver's seat of his vehicle. Tolentino says a short phrase, to which Detective Nerio responds, "Manejo bien," and "Ok," but the audio of whatever else Tolentino says is unintelligible and is ignored by Detective Nerio. Detective Nerio then speaks with another officer before going over to the front passenger side of his vehicle. Tolentino can then be heard saying something to Detective Nerio, but the audio is unclear. Detective Nerio says something to Tolentino in Spanish then ignores him. Based on this evidence, the trial court overruled Tolentino's objection and proceeded with a Spanish interpreter.

The State compares this case to *Martins v. State*, where the defendant complained that he required a Portuguese interpreter but was given a Spanish interpreter. *See Martins v. State,* 52 S.W.3d 459, 471 (Tex. App.—Corpus Christi-Edinburg 2001, no pet.). But there are significant differences. In *Martins*, the defendant did not request a Portuguese interpreter or object to a Spanish interpreter. *See id.* Here, Tolentino did both. Moreover, the record in *Martins* lacked any evidence of the defendant's difficulty understanding Spanish. *Id.* at 472. Instead, there was evidence that the defendant had a Spanish-speaking wife, testified at trial in Spanish, and communicated with his attorney in Spanish. *See id. Martins* was decided based on the defendant's failure to object to the appointment of a Spanish translator and the lack of evidence that he required a Portuguese interpreter. *See id.* at 473. That is not the case here. Tolentino made his request and objection clear to the trial court, and the trial court was aware that Tolentino's Spanish-speaking attorney had his "primary communications" when first hired through Tolentino's brother who had "a little bit more" understanding of Spanish than Tolentino.

Upon Tolentino's objection, the trial court asked whether Tolentino communicated with his family members in Spanish. Trial counsel responded that Tolentino communicates with his family primarily in Nahuatl because they are from the same region of Mexico and that Tolentino's job does not require him to communicate "with anybody really[] but himself." Trial counsel also highlighted

that Nahuatl can be a difficult language because there are no phrases or words for certain terms and that his primary communication with Tolentino relied on Tolentino's brother as his interpreter.

The only evidence that Tolentino understood Spanish was Detective Nerio's testimony about the video of the arrest. But the video does not support Detective Nerio's testimony that Tolentino had full conversations with him. *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (declining to give "almost total deference" to trial court's implicit findings where video contradicts essential portions of testimony). Detective Nerio is repeatedly asking Tolentino the same questions, sometimes getting no response, and Tolentino gives blank stares, mumbles, speaks unintelligibly, and points down the street. What little Spanish is spoken by Tolentino are the same few phrases.

A defendant may receive a fair trial absent a perfect translation. *Linton*, 275 S.W.3d at 508; *see generally Linton v. State*, 246 S.W.3d 698 (Tex. App.—Corpus Christi-Edinburg 2007), *rev'd on other grounds*, 275 S.W.3d 493, 495 (Tex. Crim. App. 2009). In *Linton*, the deaf defendant testified at a suppression hearing using an American Sign Language interpreter that she never learned to read or write English and was unable to communicate with the arresting officer. *Linton*, 246 S.W.3d at 700. But she often answered questions before the interpreter translated them, and there were direct exchanges between the trial court and the defendant using an

American Sign Language interpreter. *Linton*, 275 S.W.3d at 505–06. These exchanges reflected the defendant's "ability to communicate effectively." *Id.* at 506. There was also evidence that the defendant graduated from high school, was admitted to college, understood sufficient English to obtain a driver's license, could communicate sufficiently with another person to exchange information related to a car accident, and could follow law enforcement's instructions. *Id.* at 509. The arresting officer testified that he communicated with the defendant by writing her notes which she would read and then answer verbally. *Id.* at 496. At the hearing, the defendant also clarified testimony provided by the arresting officer. *See id.* The trial court denied the motion to suppress.

On the morning of trial, the defendant moved to reopen the suppression hearing based on the defendant's limited comprehension abilities. *Id.* at 496. The trial court deferred ruling until after voir dire when the two court-appointed interpreters were questioned by the parties. The interpreters testified that they were able to effectively convey what was being said to the defendant by using transliteration,[5] which is what the defendant was using with them. *Id.* Trial

---

[5] "Transliteration is the means by which spoken English is converted word for word into visual English. . . . Transliteration conveys the words being spoken. It does not decode the spoken English—that is, it does not get to the meaning. Rather, it recodes the English, making the spoken word visible, either in signed form or orally." Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WISC. L. REV. 843, 871 (2003).

proceeded.[6] The next day, the defendant moved for mistrial based on competency. The trial court held a hearing on the mistrial issue and heard testimony from the defendant's pastor, who testified that the defendant communicated using a combination of English and broken ASL, and from the director of the graduate program in deaf education from Lamar University, who testified that transliteration does not help someone like the defendant and that the defendant did not understand what was going on during trial but that having a deaf interpreter appointed would allow the defendant to understand the proceedings. *Id.* at 497–98. The trial court denied the mistrial request and appointed an additional interpreter, not a deaf interpreter, to sit with the defendant "to break down anything to the level at which [the defendant] can understand." *Id.* Defense counsel responded, "I can live with that."[7] *Id.* at 498. The trial proceeded using these interpreters. The defendant then moved for a new trial, arguing that she did not understand what was happening using the two interpreters. *Id.* at 499. The trial court held a hearing, heard testimony on the matter, and denied the motion. *Id.*

---

[6]     It is unclear whether the trial court was using one or two interpreters at this point. *Compare Linton*, 275 S.W.3d at 496 (explaining how two court-appointed interpreters testified), *with Linton v. State*, 246 S.W.3d at 700 ("trial proceeded with a single interpreter").

[7]     The defendant later argued the additional interpreter was inadequate because the interpreter was restricted to only communicating with the defendant during breaks in trial. *Linton*, 275 S.W.3d at 498. The trial court again denied the motion for mistrial and the motion to suppress. *Id.*

The record before us is significantly different. Here, there are no communications by Tolentino to the trial court demonstrating Spanish competency. Tolentino never had an exchange with the trial court, nor did he testify before any ruling on what type of interpreter should be appointed. The trial court here also did not have evidence showing the defendant's ability to understand, like the trial court in *Linton* did.

In *Linton*, there was evidence of the defendant's ability to communicate in English based on her graduation from high school, admission to college, possession of her driver's license, ability to exchange insurance information after a car accident, and an explanation of how she communicated with the arresting officer. Additionally, when confronted again at trial with the defendant's inability to communicate effectively, the *Linton* trial court took additional steps to safeguard the defendant's rights by appointing a table interpreter who was not restricted to literal translations and was given the instructions to "break down anything to the level at which [the defendant] can understand." The trial court here took no similar steps.

In reaching its holding, the *Linton* court considered cases from across the country where defendants were given interpreters in languages other than what they requested. First, in *People v. Warcha*, there was ample evidence of the defendant's Spanish proficiency despite his late request for a Quiche interpreter. *People v. Warcha*, 17 A.D.3d 491, 492–93 (N.Y. App. Div. 2005). The appellate court

13

reviewed the trial court's rulings, based on the evidence available to the trial court at the time it ruled, to not nullify proceedings that occurred before the defendant's request for a Quiche interpreter and to continue with trial using the Spanish interpreters. *Id.* The defendant raised his request for a Quiche interpreter 10 months into the case, after pretrial proceedings, and two days into jury selection. *Id.* at 492. The trial court had two Spanish interpreters independently interview the defendant, and they reported that the defendant could understand Spanish if they spoke slowly. *Id.* The trial court ordered a recess to locate a Quiche interpreter, but none was found. Before proceeding without a Quiche interpreter, the trial court had a conversation with the defendant and determined that the defendant was proficient in Spanish. *Id.* The trial court also instructed the interpreters to signal the court whenever necessary to ensure that the defendant would have the proceedings fully explained to him. *Id.* at 493. Moreover, the defendant had communicated in Spanish with co-workers for two years, his education was in Spanish and Quiche, and he had communicated with counsel in Spanish during the 10 months of his case. *Id.* at 492–93.

Another case *Linton* considered, *Gado v. State*, held that proceeding with a French interpreter over the defendant's objection and request for a Djerma interpreter was permissible when there was ample evidence that the defendant understood French and English. *Gado v. State*, 882 N.E.2d 827, 830–31 (Ind. Ct. App. 2008). The trial court attempted to procure a certified Djerma interpreter upon

14

the defendant's request but only found two uncertified Djerma interpreters. *Id.* at 829. During trial, the interpreters told the trial court that they were threatened with repercussions if they continued translating. *Id.* The trial court suspected the defendant made these threats and declared a mistrial. *Id.* The trial court tried unsuccessfully to find another Djerma interpreter. *Id.* During a hearing to determine the defendant's language proficiency, the trial court recalled interacting with the defendant on several occasions in English and that the defendant had participated in earlier proceedings using a French interpreter. There was also evidence that the defendant had conversations in English lasting over an hour on various topics, including his family, where he lived, and his criminal history. *Id.* at 830–31.

Finally, *Linton* also considered *Costa v. Williams*, where the appellate court found that using a Spanish interpreter was sufficient when there was evidence that the Portuguese defendant gave detailed answers to the trial court's questions and did not request a Portuguese interpreter until his habeas petition. *Costa v. Williams*, 830 F. Supp. 223, 224 (S.D.N.Y. 1993). The defendant's petition was also written in English and signed by him without any indication that an interpreter was used or needed. *Id.* at 224 n.2.

Here, Tolentino made the trial court aware of his need for a Nahuatl interpreter a year before trial. No independent Spanish interview was done with Tolentino before trial. Trial counsel informed the trial court that he had used a Nahuatl speaker

15

to communicate with Tolentino. And Tolentino's family communicated in Nahuatl. Thus, the cases highlighted in *Linton* are inapposite.

Because the trial court was aware that Tolentino had difficulty understanding English, it was required to ensure that the trial proceedings were translated into a language that Tolentino could understand. *Garcia v. State*, 149 S.W.3d 135, 145 (Tex. Crim. App. 2004). The trial court recognized the need for a Nahuatl interpreter and delayed the trial for a year to procure one, but it changed course based on testimony from Detective Nerio. While a trial court "must be given wide discretion," the ultimate question before this Court is whether any inadequacy in the interpretation made the trial fundamentally unfair. *Linton*, 275 S.W.3d at 503. *Linton* instructs us that we measure the trial court's decision on interpretive services by whether the defendant has a basic understanding of the proceedings to support his participation in them. *See id.* at 500–04 (trial is fundamentally unfair when defendant is unable to assist in his own defense).

The record shows that during Tolentino's arrest he appeared confused and spoke minimal broken Spanish, that Tolentino communicates with his family primarily in Nahuatl, and that trial counsel, a Spanish speaker, used a Nahuatl speaker to communicate with Tolentino, so it follows that Tolentino would not be able to understand the proceedings well enough to assist in his own defense absent a Nahuatl interpreter. The record also reflects that a Nahuatl interpreter was

16

available, at least virtually, but that the trial court chose not to use that interpreter. We find that the interpretation provided was inadequate because Tolentino required a Nahuatl interpreter, so the trial was fundamentally unfair. *Id.* at 505 (defendant is denied due process when "the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension" (internal quotation omitted)). Accordingly, the trial court's decision to proceed with a Spanish interpreter was an abuse of discretion.

The motion for new trial evidence does not alter this conclusion. Tolentino submitted his affidavit, the affidavit of the person who helped him prepare his affidavit, record excerpts, and emails indicating there was a Nahuatl interpreter available. The trial court excluded the emails but admitted the remaining three exhibits. During the hearing on Tolentino's motion for new trial, the trial court heard from the court interpreter, I. Zavala. The State asked if Zavala had had a "sort of introductory conversation with Tolentino" in Spanish. Zavala said, "Yes." The State next asked if Tolentino ever indicated to her that he had trouble understanding. She responded, "No." She said she always asks the defendant if they understand and that Tolentino responded in Spanish, "Everything's fine. Everything's fine. Thank you."

On cross-examination, Zavala agreed that she could not say that Tolentino understood the translation of any specialized language, such as forensic testimony about blood alcohol content, in Spanish during the trial.

17

The State called another court interpreter who did not recall the trial.

No one asked Zavala what the "introductory conversation" was that she had with Tolentino. In any case, it was her job to translate, not to test Tolentino's ability to understand Spanish beyond introductory conversation or ensure he fully understood the proceedings or understood enough Spanish to assist in his own defense. It is the job of the trial court to implement the defendant's right to interpretation when there is a language barrier. *See Miller v. State*, 177 S.W.3d 1, 6 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The interpreter's testimony is not sufficient to support a conclusion that Tolentino could understand Spanish sufficiently to receive a fair trial. Because we reverse based on a violation of Tolentino's due process rights, we need not consider Tolentino's remaining constitutional challenges or the remaining issue on his motion for new trial. *See* TEX. R. APP. P. 47.1. We sustain Tolentino's due process issue.

**Conclusion**

We reverse and remand for new trial.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly and Landau.[8]

Publish. TEX. R. APP. P. 47.2(b).

---

[8] The original panel consisted of Justices Kelly, Landau, and Farris. Justice Farris no longer sits on this Court. *See* TEX. R. APP. P. 49.3.