**Opinion filed September 25, 2020**



## In The

# 𝕰𝖑𝖊𝖛𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

_____

## No. 11-18-00235-CR

_____

## AKEEM ENAKELE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from County Court at Law No. 2**
**Ector County, Texas**
**Trial Court Cause No. 17-4656-CCL2**

## M E M O R A N D U M   O P I N I O N

The jury convicted Akeem Enakele of violating a protective order issued for the protection of Charlotte Davis, formerly Charlotte Enakele. TEX. PENAL CODE ANN. § 25.071(a)(2) (West Supp. 2019); TEX. FAM. CODE ANN. § 85.001(a), (b) (West 2019). In accordance with an agreement between Appellant and the State, the

trial court assessed Appellant's punishment at confinement in jail for a period of 286 days and granted Appellant credit of 286 days for time served.

Appellant presents two issues on appeal. In his first issue, Appellant contends that the trial court erroneously failed to sua sponte appoint an interpreter for Appellant. In his second issue, Appellant asserts that the trial court erred by not redacting a family violence finding that was contained in the protective order that Appellant was alleged to have violated. He also asserts that the trial court should have provided limiting instructions when it admitted the protective order into evidence and in its charge to the jury. We modify and affirm.

*Background Facts*

Davis testified that she met Appellant online. After dating, the couple eventually married on August 25, 2016, but subsequently divorced on September 12, 2017. Prior to the divorce, Davis obtained a protective order against Appellant.

The protective order was admitted into evidence after defense counsel reviewed the document and stated that he had no objection to its introduction. After the trial court made its ruling and admitted the protective order into evidence, but before the protective order was published to the jury, defense counsel informed the trial court that he objected to the admission of the unredacted protective order because it referenced a prior instance of family violence. After hearing arguments of counsel, the trial court overruled Appellant's objection.

The protective order specified that Davis was protected by its terms for a two-year period. In addition to other restrictions, the protective order prohibited Appellant from communicating with Davis in any manner except through Appellant's attorney. The protective order also prohibited Appellant from going within 500 yards of Davis.

Five days after their divorce became final, Appellant approached Davis from behind as she was walking in Buffalo Trail Park. Appellant grabbed Davis from behind, placed his arm around her shoulders toward her neck, pressed into her, and loudly yelled in her ear, "I got you." Davis did not see Appellant until after he had grabbed her, and Appellant's acts surprised, shocked, and scared her. Davis broke away from Appellant's arm hold and told him to leave her alone. Based on Appellant's facial expression, Davis believed that Appellant thought the encounter was funny in a non-joking way. When Davis asked a nearby couple to help her by calling 9-1-1, Appellant ran toward the parking lot. The man called 9-1-1, and Davis provided a statement to police.

Joe Hodgins testified that, on September 17, 2017, he was walking at Buffalo Trail Park with his mother and sister when he saw Appellant, who had been standing near some cars, jog toward a woman who was twenty yards in front of Hodgins. Hodgins saw Appellant grab the woman so that their sides touched and then hold and restrict her by placing both of his arms around her "in a pretty tight bear hug." He then heard Appellant loudly say, "I got you." The woman was not smiling while Appellant had his arms around her; she seemed very confused, scared, and frightened and appeared to be unsure of what was happening.

Hodgins testified that, after Appellant grabbed the woman, Appellant seemed to be very alert as to whether he was being watched and turned and smiled while he spoke in a low tone to the woman. The woman seemed uncomfortable, and Hodgins heard the woman cry out in distress. Hodgins approached and asked if there was a problem. Appellant looked at Hodgins and quickly jogged or ran toward his car and left. Hodgins asked the woman if the police needed to be contacted. The woman answered, "Yes," and informed Hodgins that she had a restraining order in place. Hodgins called 9-1-1 because the woman seemed very scared and frightened by what

3

had happened and continued to look around to see if "somebody" was coming back and because Hodgins did not know whether Appellant was dangerous.

Corporal Andrew Garris of the Odessa Police Department responded to the 9-1-1 call. After speaking with Davis, he confirmed that a protective order was in place that restricted Appellant from communicating with Davis. Corporal Garris obtained statements from Davis and Hodgins, and he then presented the case to detectives.

Against defense counsel's advice and admonishments, Appellant testified at trial. Appellant was unsure whether he was at the park before Davis arrived, but he stated that, after he sat down, she came over to him. Appellant then stated that he was at the park before the reported incident but that he did not see Davis or anyone approach him because he had been looking at his phone and reading his messages. Appellant testified that he did not do what had been alleged. He also spoke of other domestic matters and noted that he had been sleeping in his car. The trial court instructed Appellant to answer the specific questions asked and to refrain from speaking of other matters. When the trial court asked Appellant whether he understood, Appellant stated that he did.

Without questioning, Appellant then stated that the correct date of the encounter was October 15. The trial court informed Appellant that he needed to answer the questions asked in order to achieve orderly proceedings, and Appellant responded, "Okay, Sir." In response to defense counsel's questioning, Appellant testified that he had been alone at the park and using his phone when Davis approached him.

Under cross-examination, Appellant explained that, at the time the divorce became final, he had been in New Mexico and traveled to Odessa to sign the divorce papers. He agreed that he was present at the protective order hearing in June 2017

4

and that he understood that, for a two-year period, he was not to communicate with Davis without an attorney's assistance and was not to go within a specified distance of Davis.

After he initially denied being at the park, Appellant again stated that he did not see Davis there but admitted that she may have been present. Appellant denied that he touched Davis and stated, "That's why I say they should bring surveillance video." Appellant again claimed that Davis had approached him and shouted his name and that, when he looked up, he saw Davis in front of him. He did not stay to speak with police because a protective order was in place.

Appellant also testified that he had called the sheriff several times on prior occasions because Davis had come to him and then had threatened to call the police on Appellant. He again claimed that the encounter in the park occurred on October 15, 2017, that he was working in New Mexico from September 7 – 22, 2017, and that he was not present in Odessa on September 17, 2017. He also asserted that his manager transported him to Odessa on September 11, 2017, for the purpose of signing the divorce papers the following day. Appellant testified that he immediately returned to New Mexico and that he did not return to Odessa until September 22, 2017. Appellant testified that he left work on October 15, 2017, and he explained what had transpired both at work and before he arrived at the park that day.

Appellant stated that Davis had lied about their encounter and proclaimed that he would never lie. He asserted that he had tried to move away from Davis at the park and that a "Mexican man" that was "fat" and his "fat" wife kept asking him what had happened. Appellant claimed that he had called the sheriff several times because Davis kept following Appellant and coming to his apartment. Appellant also explained that he always went to that park for his workouts. According to

5

Appellant, Davis knew that he always went to the park, and she had been following him.

During Appellant's testimony, the trial court repeatedly instructed him to answer only the question that was asked and to refrain from volunteering information in narrative form. Appellant asserted that he did not want to be with Davis and had divorced her. Appellant claimed that Davis's acts were motivated by the divorce court's directive that Davis return Appellant's personal items to him.

*Analysis*

In his first issue, Appellant argues that his right of confrontation was improperly abridged by the trial court's failure to sua sponte appoint a translator to assist him at trial. The Sixth Amendment to the United States Constitution guarantees an accused person the right to confront witnesses in a criminal prosecution, and this right requires that an interpreter be provided to an accused who does not understand English. *Garcia v. State*, 149 S.W.3d 135, 140–41 (Tex. Crim. App. 2004).

The right to an interpreter is a category-two *Marin* right—a right that must be implemented unless expressly waived. *Id.* at 144 (citing *Marin v. State*, 851 S.W.2d 275, 279–80 (Tex. Crim. App. 1993)). Although waivable, the right to an interpreter is not deemed to have been waived if the trial court is aware that the accused person does not speak or understand English. *Id.* at 143, 145; *see Baltierra v. State*, 586 S.W.2d 553, 559 (Tex. Crim. App. 1979) (holding that, when it is made known to the trial court that an accused does not speak and understand English, an interpreter must be provided for the benefit of the accused). Consequently, in the absence of a knowing and voluntary waiver by the accused person, a judge possessing such awareness bears an independent duty to implement the accused person's right to an interpreter. *Garcia*, 149 S.W.3d at 145. "The judge may become aware of the

6

defendant's language problem either by being informed of it by one or both parties or by noticing the problem *sua sponte*." *Id.* Whether a motion is made by the court or a party, Article 38.30 of the Texas Code of Criminal Procedure requires that an interpreter be provided for an accused person or witness after a determination is made that the person does not understand and speak English. TEX. CODE CRIM. PROC. ANN. art. 38.30(a) (West 2018).

It is the trial court's task to ensure that the defendant sufficiently understands the proceedings against him to be able to assist in his own defense. *Linton v. State*, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009). As noted by the court in *Linton*:

> Decisions regarding adequate interpretive services depend upon a potpourri of factors, including the defendant's understanding of the English language and the complexity of the pertinent law and its procedures, and the testimony. Therefore, the trial judge—having the defendant in his presence, observing his level of comprehension, and asking him questions, has wide discretion in determining the adequacy of interpretive services.

*Id.* Accordingly, we review the trial court's decisions concerning interpretive services for an abuse of discretion. *Id.* at 502.

We first note that there are no facts in the appellate record regarding Appellant's background or specifically addressing his ability to speak and understand English. However, Appellant asserts on appeal that he is a noncitizen who "does not use the grammar of a native English speaker." Appellant concedes that he did not object to a lack of translation services and that no party suggested to the trial court that Appellant did not speak or understand English. We do not find in the record any motion either seeking or expressly waiving translation services for Appellant. Appellant argues, however, that several of his responses during pretrial and trial proceedings suggest that his understanding of English at trial was deficient.

7

Appellant first directs us to a pretrial hearing when the trial court appointed new counsel to represent Appellant because the judge who had signed the underlying protective order subsequently was appointed to defend Appellant for his alleged violation of that order. After the trial court heard counsels' explanations regarding the conflict, it asked Appellant whether he wished to say anything about any concerns he may have had. Appellant responded, "No. All I know, I didn't do it." The trial court explained that it was only addressing the conflict of interest at that time because his appointed defense counsel had signed the protective order as judge. Upon hearing this explanation, Appellant answered, "Yes, sir." The trial court explained that it was going to appoint new counsel and that it would have new counsel visit with Appellant about the case. The trial court then asked Appellant whether he understood. Appellant replied, "Yes, sir," and he then asked the trial court, "How soon is that going to be?" After the trial court answered Appellant's question, Appellant reminded the trial court, "I told you I wanted a quick trial."

The court reporter included a remark in the record at this juncture which specified that a portion of Appellant's response was unintelligible. However, the trial court responded, "I understand," and explained to Appellant that it would quickly notify new counsel of the appointment and would encourage counsel to swiftly contact Appellant. Appellant answered, "Okay, sir," and thanked the trial court at the conclusion of the pretrial proceedings.

No interpreter was present at trial. After the information was read to Appellant at the outset of trial, the trial court asked Appellant whether he wished to plead guilty or not guilty. Appellant answered, "I am not guilty, sir." Before testifying, the trial court asked Appellant to spell his name, and Appellant stated his whole name, then stated his last and first names and spelled each.

There are instances in the reporter's record where the court reporter noted that some of Appellant's statements were unintelligible. But as is true of many native English speakers, it is apparent from the context of Appellant's answers throughout the record that he sought to tell as much as he could in narrative form when given the opportunity to answer or speak. On several occasions, the trial court admonished Appellant to specifically answer only the question asked and to refrain from "saying a bunch of other stuff" and "volunteering a whole bunch of information in a narrative." The trial court directed Appellant to "[a]nswer [the] question and then stop talking."

We have reviewed the record and disagree with Appellant's assertion that his grasp of the English language was insufficient to enable him to understand the nature and course of the trial proceedings, to appropriately respond to the questions presented to him, or to assist counsel in his defense. Appellant aptly testified that he was working in New Mexico on the date of the alleged September encounter in the park and repeatedly asserted that Davis had approached him in the park in October. Appellant never stated that he did not understand what was being said or asked of him at trial. Furthermore, defense counsel, the prosecutor, and the trial court did not have to ask Appellant to repeat any of his responses. Appellant's imperfect use of English grammar was not far afield from that of many native English speakers.

The trial court did not abuse its discretion by not sua sponte appointing an interpreter for Appellant. As noted in *Linton*, the trial court is in a much better position to assess the defendant's comprehension of the proceedings. 275 S.W.3d at 500. The record shows that Appellant possessed a sufficient understanding of English, as well as an ability to convey his answers and statements in English, and that the trial court was not aware—nor made aware—of Appellant's alleged inability

to understand or speak English. Accordingly, the trial court was under no duty to appoint an interpreter for Appellant at trial. *See id.*; *Garcia*, 149 S.W.3d at 143, 145. We overrule Appellant's first issue.

In his second issue, Appellant asserts that the trial court erred when it overruled his objection to the admission of an unredacted copy of the protective order. The State contends that Appellant failed to preserve this issue for our review because Appellant's complaint on appeal does not comport with his complaints at trial. Specifically, the State argues that Appellant complained at trial that the prosecutor failed to comply with the notice requirements of Rule 404(b)(2) and that he now presents a character-conformity argument under Rule 404(b)(1). *See* TEX. R. APP. P. 33.1(a). We agree with the State's contention.

Rule 404(b)(1) prohibits the admission of evidence of a crime, wrong, or other act to prove a person's character to show that, on a particular occasion, the person acted in conformity with that character. TEX. R. EVID. 404(b)(1). Rule 404(b)(2) permits the admission of such evidence for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. TEX. R. EVID. 404(b)(2). When a defendant in a criminal case makes a timely request, the prosecutor is required to provide the defendant reasonable pretrial notice of the prosecutor's intent to introduce such evidence in the State's case-in-chief, unless it is same-transaction evidence. *Id.*

To preserve a complaint for review on appeal, the record must show that the objecting party timely presented the complaint to the trial court and that the trial court ruled or refused to rule on the complaint presented. *See* TEX. R. APP. P. 33.1(a). "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial." *Pena v. State*, 285

S.W.3d 459, 464 (Tex. Crim. App. 2009) (citing *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005)).

At trial, defense counsel objected to the State's proffer of the entire protective order. Defense counsel initially noted that a motion in limine precluding prior bad acts was in place. During the subsequent conference at the bench, defense counsel asserted that Appellant had asked for notice "of any prior bad acts" and that, without notice of the specific details, he was unable to "investigate it."[1] At one point during the bench conference, defense counsel stated, "Redact it."[2]

In response, the prosecutor asserted that Appellant had notice of every part of the protective order and explained that the State did not intend to examine the underlying details that led to the issuance of the self-authenticating protective order. The State asserted that the protective order constituted the foundation of the offense being tried, that it had been identified within the information that charged the offense being tried, and that it was required by statute to include a finding of family violence as well as a likelihood of future family violence. *See* FAM. § 85.001(a), (b). Defense counsel countered that, although the protective order was an element to be proven by the State, the prior act of family violence was not an element to be proven. The trial court overruled Appellant's objection and admitted the unredacted protective order into evidence.

On appeal, Appellant presents a character-conformity-based argument under Rule 404(b)(1) to challenge the trial court's evidentiary ruling that admitted the protective order into evidence. However, the record shows that Appellant did not raise a character-conformity objection at trial under Rule 404(b)(1) to the effect that

---

[1]During the hearing on the motion in limine, defense counsel asserted that the State had not provided him notice of extraneous offenses as requested.

[2]The context of this request is not clear because the attorneys were speaking over each other during the bench conference.

the State was trying to offer the evidence for an improper purpose. Instead, Appellant made a "notice" objection under Rule 404(b)(2), complaining that, without notice, he was unable to investigate the prior act of family violence. Because his complaint on appeal does not comport with his complaint at trial, Appellant's second issue is not preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Pena*, 285 S.W.3d at 464.

Moreover, even if we assume that Appellant's arguments were preserved, we conclude that they do not entitle him to relief. The issue of whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). Under Rule 404(b), "[t]he trial judge must conclude that the evidence tends in logic and common experience to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We must affirm the trial court's ruling if that ruling is within the zone of reasonable disagreement. *Id.* Consequently, we review a trial court's ruling on the admissibility of extraneous offenses for an abuse of discretion. *De La Paz*, 279 S.W.3d at 343.

Here, the evidence was relevant to a material, non-propensity issue regarding the existence of the protective order that Appellant was alleged to have violated. To establish the offense of violation of a protective order, the State must prove that a protective order was issued and that the defendant intentionally or knowingly violated the order by committing specified acts. *See Avilez v. State*, 333 S.W.3d 661, 670 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("A conviction for violation of a protective order requires proof of a protective order issued under Chapter 85 of the Family Code and proof that the defendant (1) one time, (2) intentionally or

knowingly violated that order, (3) by committing family violence or another specified action, by communicating with or threatening a protected person, or by going to or near the home or workplace of a protected person."). The protective order was admitted as evidence for the purpose of establishing its existence and the restrictions that it placed on Appellant. Accordingly, the trial court did not abuse its discretion by admitting the unredacted protective order into evidence.

Appellant also complains that the trial court failed to give a limiting instruction to the jury and failed in its charge to instruct the jury that it was not to consider "the allegations of family violence in the protective order as proven beyond a reasonable doubt or . . . relevant to the case at hand." However, Appellant did not ask the trial court either to instruct the jury to restrict its consideration of the family-violence finding embodied by the protective order or to include in its charge the limiting instruction that Appellant now asserts should have been given. Appellant could have requested a limiting instruction to lessen the danger of prejudice that may have arisen from the trial court's admission of the protective order and its unredacted reference to a finding of family violence. *See Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994).

To preserve a claim of error regarding evidence that is not admissible for other purposes, Rule 105 requires that the party must request the trial court to restrict the evidence to its proper scope and to instruct the jury accordingly. TEX. R. EVID. 105(b)(1). Appellant did not request that the trial court issue a limiting instruction to the jury. "A failure to request a limiting instruction at the time evidence is presented renders the evidence admissible for all purposes and relieves the trial judge of any obligation to include a limiting instruction in the jury charge." *Williams v. State*, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008); *see Delgado v. State*, 235 S.W.3d 244, 251 & n.26 (Tex. Crim. App. 2007); *Watson v. State*, 337

S.W.3d 347, 353–54 (Tex. App.—Eastland 2011), *aff'd*, 369 S.W.3d 865 (Tex. Crim. App. 2012). We overrule Appellant's second issue.

*This Court's Ruling*

The trial court's judgment incorrectly notes that Appellant pleaded guilty. We modify the judgment to reflect that Appellant pleaded "not guilty." As modified, we affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


September 25, 2020

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[3]

Willson, J., not participating.

---

[3]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.